E. P. TAYLOR v. THE STATE.

No. 1429. Decided January 26, 1898.

1. **Dying Declarations—Admissibility—Predicate—Disconnected Statement.**

Where it is shown that the declarant was conscious of approaching death, and had no hope of recovery, a sufficient predicate is established to admit his dying declarations as evidence. And the declarations are not rendered inadmissible from the fact that declarant was, at the time, partially under the influence of opiates, and had to be aroused from time to time to continue his statement—the statement being intelligent, continuous, and logical, and not made in answer to questions calculated to induce it.

**2. Same—Admission of Dying Declarations Not Violative of the Constitution.**

The admission in evidence of dying declarations is not obnoxious to the constitutional provision, Bill of Rights, section 10, which guarantees to an accused the right to be confronted with the witnesses against him. Following Burrell v. State, 18 Texas, 718.

**3. Impeachment of a Witness by Contradictory Statements.**

A witness can only be impeached by proof of contradictory statements, when he has testified to some material fact about which it is proposed to contradict him. A witness can not be asked after he has testified to criminating facts, whether he has not previously said the defendant was not guilty; nor can he be impeached by proof as to how he narrated the circumstances of the occurrence to a third party, where the witness had testified as to no such facts, but, on the contrary, testified to facts showing that she was not present at the particular time spoken of, and could not, and did not, know personally the facts as it was proposed to prove she had previously narrated them.

**4. Dying Declarations—Questions Asked—Charge of Court.**

Where some controversy had arisen as to whether the dying declarations were freely and voluntarily made, and the court, after instructing the jury not to consider them if not made under the safeguards required by law, further instructed them: "It would be no legal objection to said declaration, that questions were asked him directing his mind to the subject or part of the subject upon which said declaration was made. Nor do such questions take from said declaration its voluntary character." Held to embody a correct rule of law and not to be upon the weight of evidence.

**5. Murder—Charge as to Provoking Difficulty by Defendant.**

On a trial for murder, where deceased's dying declarations introduced in evidence stated that defendant had used opprobrious epithets towards him, and had stabbed him before he clinched with defendant, the court properly charged the jury, that if defendant provoked the difficulty with apparent intention of killing or doing deceased serious bodily harm he would be guilty of murder although he might have done the act suddenly without deliberation, and in order to save his own life.

**6. Same—Self-defense.**

Where the parties had had a previous altercation in the dance room, and defendant went out into the corridor and laid in wait for some time; and as soon as deceased appeared denounced him in a violent manner, it is clear he intended and did premeditatedly provoke the difficulty, and it is absolutely immaterial whether the deceased struck the first blow so far as his rights are concerned.

**7. Same—Resort to All Other Means—Charge.**

On a trial for murder, where the evidence showed that if deceased made any attack at all upon defendant it was not with intent to murder, or inflict serious bodily injury upon him, the court properly charged that the jury should find, before he was authorized to slay deceased, that he resorted to all other means except retreating.

**8. Same—Conspiracy—Instructions.**

Where the evidence utterly fails to show a conspiracy, it is proper for the court to refuse special instructions embodying self-defense predicated upon the idea of a conspiracy between the deceased and others to attack defendant.

**9. Jury Law—Separation of Jury—New Trial.**

A short temporary separation of one or more jurors from their fellows will constitute no material error or ground for new trial, where it is shown that during the separation they were accompanied by or all the time in view of an officer, the body of the jury at the same time being also in charge of officers, and where there was no such separation as would in anywise prejudice the rights of appellant.

APPEAL from the District Court of Mitchell, on change of venue from Nolan. Tried below before Hon. R. A. RAGLAND, Special Judge.

Appeal from a conviction for murder in the second degree; penalty, ten years imprisonment in the penitentiary.

On November 5, 1895, appellant was indicted by the grand jury of Nolan County, Texas, for the murder of W. H. Flowers, charging him with said murder on October 16, 1895, by cutting and stabbing him with a knife. In November, 1895, appellant was tried in the District Court of Nolan County, Texas, and there was a mistrial; and at the April term of the District Court of Nolan County, Texas, appellant was again tried in said court, and a mistrial resulted, and on the 18th day of April, 1896, the court, on its own motion, changed the venue of this cause to Colorado, Mitchell County, Texas, for trial, and at the fall term of the District Court of Mitchell County, Texas, this cause was tried and resulted in a hung jury, and on June 7, 1897, this cause was again tried and resulted in a verdict of guilty of murder in the second degree, the penalty assessed being ten years in the State penitentiary.

On the night of the 16th of October, 1895, a concert or show was to take place in the courthouse in the town of Sweetwater, Nolan County, and Granville Flowers and "Drummy" Campbell got up a ball, to take place after the performance was over, and arranged to have a supper at midnight. They employed the deceased, W. H. Flowers, to act as "floor manager," and to call the sets for the dances. The price for the tickets to the ball and supper was 50 cents. Granville Flowers watched the door and sold tickets. It seems that E. P. Taylor, the defendant, did not live at the town of Sweetwater, and the record does not disclose his place of residence. He did not know the two Flowers, and did not know any of the ladies at the dance. He bought a ticket for the ball, and Granville Flowers introduced him to Mrs. W. H. Flowers, the wife of the deceased, with whom he danced the first set. The dance was in the courtroom, and W. H. Flowers, the deceased, called the dances from the bar. The supper table was set in the grand jury room, which adjoined the courtroom; and both the courtroom and the grand jury room, which were in the second story of the building, had doors opening upon a corridor or hall at the head of the stairway leading from the ground floor; this corridor was not lighted up, save by the lights from the courtroom and the grand jury room. The defendant, Taylor, engaged a partner and took his place upon the floor for the second set. When the music struck up, both he and the deceased (Flowers) commenced calling the dance about the same time. Defendant held up his finger and said, "Here, I'll do this calling." Deceased said, "No; I'm calling it." Defendant said, "I will damned sure call it, if it is called." Deceased then walked over towards defendant, and said, "I will call it, if it is called, for I was employed to do the calling." Other parties interfered—some of whom remonstrated with the defendant, and told him that he would break the dance up in a row if he persisted in his intention to call it. Defendant then desisted and the dance proceeded, deceased calling it. This occurred between 11 and 12 o'clock at night. After this dance was over, the defendant seems to have disappeared from the courtroom and was not seen again until the fatal difficulty. About 1 o'clock the guests went in to supper. After they had eaten, but before they had quit the room, Granville Flowers and Camp-

bell were seen off to one side having a private conversation in a low tone. Deceased left his wife at the supper table and stepped out into the corridor, and some of the witnesses say they saw him standing in the door of the courtroom, where he and defendant seemed to be engaged in an altercation, and soon clinched. The State's witnesses testified that defendant seized deceased around the body. They saw the parties stoop over, and at the same time saw the defendant striking under as though with a knife. Some of defendant's witnesses testified that deceased struck at, or struck, defendant before the parties clinched. The noise of the scuffling immediately attracted the attention of the whole crowd, several of whom rushed to the scene. Granville Flowers grabbed the defendant by his arm, and Duke Taylor, a brother of the defendant, had seized hold of the deceased by his arm. And the parties were engaged in scuffling, when about this time Mrs. Bessie Flowers, the wife of deceased, seeing Duke Taylor having hold of her husband, struck him one or two blows in the face with her fists, Duke Taylor protesting that he was trying to separate the parties, as he afterwards on the trial swore was his intention, and Granville Flowers also swore that such was his intention. There was no evidence that either one of the parties was thrown to the ground during the conflict, or that one or more of the parties had jumped onto the defendant while it was going on. As soon as the parties were separated, deceased was pushed into the courtroom, and there one or more witnesses swear they saw him put his hand into his pocket, draw out his knife, and open it. Finding that he had been badly stabbed, he was laid upon a table in the courtroom, and physicians sent for. Two physicians, Drs. Burts and Moody, arrived in a short time, and both of them examined the wounds and ministered to the wounded man. They found two cuts upon the abdomen, which had entered the abdominal wall, one of them cutting the entrails or intestines eight or nine times.

Dr. Burts testified: "Dr. Moody and myself sewed up the cuts and wounds in the flesh after sponging them out with disinfectants, and I remained with him all the time, practically, until his death." [It seems that the deceased did not die until some eleven hours afterwards.] "He died from these knife wounds. I was present when his dying statement was taken by Mr. H. C. Hord and Squire Foy. He was under the influence of opiates at the time, but not enough to affect his mind. He was of sane mind at the time, and I had before this informed him that he could not possibly recover—that his wounds were fatal. I talked with him from time to time and his mind was all right. He would, while the statement was being taken, go to sleep; that is, he would pass into a kind of slumber, when Mr. Hord would stop him to write down what he had stated, then his father would shake him a little, which would arouse him, and Mr. Hord would read to him what he had last said, and he would then proceed to state further until stopped again. This was kept up until his whole statement was taken. I believe that he fully understood all that was said to him at this time, and his language and manner of speaking while the statement was being taken was rational, clear, and intelligent.

Deceased, at the time the statement was taken, was very weak; he had lost a good deal of blood and had suffered a great deal; he was under the influence of opiates, which made him sleepy, but this did not affect his mind. As an expert, I would say that his mind was all right, and that he comprehended what he said and knew that his death was imminent. He died about eleven hours after this statement was taken, and in fact his mind was very clear up until just before he died."

H. C. Hord testified: That he was county attorney of Nolan County, and was present when deceased's dying statement was taken. "Shortly after deceased was cut, I told Dr. Moody that I wanted to take deceased's statement before he died and while he was in his right mind, and asked him to let me know the time to take it. Just before it was taken Dr. Moody came to my office and told me that now was the time to take the statement; that Flowers was in his mind all right, but was not going to live long. I got Squire Foy, took some paper, and went by to take his statement." [Here witness was handed the written statement of deceased.] "This is the statement made by the deceased. I wrote it down at the time. When I went to take it, I spoke several words to him, to satisfy myself that his mind was all right, etc. I asked him if he was conscious of approaching death. He answered that he was; that he knew that he was bound to die; and so this statement starts and embodies part of the question to make sense. I read that part to him, and told him to go ahead and tell us just how the fight occurred, and he detailed it just as it is written here. I asked him a question or so as we went through, but nothing that would lead him to make any particular answer or statement. While the statement was being taken he would seemingly drop off to sleep, but when shaken a little he would awaken a little. I would then read to him what he had last stated and tell him to go ahead, and he would do so, stating very clearly and rationally the occurrences. After we had gotten through we roused him up, and I read the statement over to him in toto, and he remarked that that was right. I think he was rational—he spoke rationally, and did not say anything that in any way seemed flighty or indicated that his mind was not all right. After it was read to him, he was raised up and took hold of the pen staff while his mark was made, and Squire Foy swore him to it."

Dr. Moody corroborated Dr. Burts' testimony, and also that of Hord, the county attorney. He says: "Deceased was perfectly rational when his statement was taken. I don't think there could be any question about that. I had been with him sometime before the statement was taken, and had given him some opiates to lull his pain, but not enough to affect him materially. While the statement was being taken he dropped off to sleep two or three times; this was when Mr. Hord would stop him to write down what he had said. Then they would shake him a little and Mr. Hord would read what he had written, and he would go ahead and make a further statement. His mind was clear and his talk sensible and rational. * * * Once, while reading what Hord had written, he called attention to a mistake and had it corrected."

The State here introduced (over defendant's objections) the dying declaration, which is as follows: "W. H. Flowers, being duly sworn: I am conscious that I am in danger of approaching death. Vat Taylor and myself had a few words about calling the set. He allowed, by God, that if he did not call the set, it would not be called. I told him that if I did not call it, it would not be called, either. The next time I saw him after the words in the ballroom, I came from the supper-room and stopped in the door of the courtroom, and I saw Vat Taylor in the corridor in the corner next to the ladder. I had my back to him, and he said to me 'I think you acted a God-damned shit-heel with me. I think you are a God-damned son of a bitch and dirty coward;' and then he stabbed me in the belly with his knife. He made all the wounds in my abdomen before I clinched him. I think he cut me on the shirt sleeve after we clinched. I never had my knife out at all in the corridor or while we were scuffling. I got it out after we separated and came in this room, the courtroom. I never noticed exactly who was out there besides Vat Taylor. I remember seeing Granville Flowers, my brother; if he had a knife I did not see it, and don't think he had any. I am absolutely sure that Vat Taylor and no one else cut me. No one but he and I was right there when he cut me.

"W. H. $\overset{\text{His}}{\times}$ FLOWERS.
$\underset{\text{mark}}{}$

"Sworn to and subscribed before me this 17th day of October, 1895.
"J. M. FOY, J. P."

Mrs. Bessie Flowers, after testifying about the first trouble with regard to calling the dance, substantially as it is above stated, said: "When supper was announced I went with my husband into the grand jury room and we took position on the north side of the table next to the door. Granville ate at the east end and Vaughan Campbell and Mattie Brown just across and in front of us. I saw Granville and Campbell go aside and talk together, but paid no particular attention to them; this was about the time supper was over with us. My husband, as soon as he finished eating, went out at the door, and in two or three minutes, or a very short time, my attention was drawn in that direction by a noise in the corridor. I rushed out, and when I got out of the door I saw my husband about half stooped over, and Duke Taylor ahold of his left arm. I rushed up and began striking Duke Taylor in the face with my fist. I struck him several times, I don't know how many times, and told him to let go of my husband. About this time my mother-in-law came up and said to Duke Taylor to let go of her child; you are killing him. Duke replied, 'Madam, we are not going to hurt your child.' We then got Willie, my husband, back into the house some two or three steps, and I was in front of him, and I said, 'Papa, are you hurt?' He was bent over and said, 'Yes, I am cut.' I then looked, and he had his left hand pressed to his left bowel. I saw the blood on his hand and clothing. Immedi-

ately after this I saw his knife in his right hand, opened, and I said, 'Papa, give me your knife.' He gave it to me, and I kept it until some time after he was put on the table, and gave it to Granville Flowers. My husband lived a couple of days after he was cut, and died from the wounds described by me. He was in his right mind all the time up until about his death. I was with him nearly all the time and talked with him, ex-cept when asleep. He never was out of his right mind at any time."

Cross-examined: "I never told Willie not to go out in the corridor after the wordy altercation on the floor; that that young fellow had apologized; nor did I hear deceased's mother say any such thing as that. I have lived in Fort Worth principally since my husband was killed. I was at Buie, Texas, for some time since the last trial here. I visited a friend in Waco about two weeks since that time. When the fight oc-curred in the hall I rushed to the door. I was standing near by it, and when I heard the noise I turned and rushed out at the door. I don't think anyone went out before me; I did not see anyone go out. I don't know where Granville Flowers was when the fight began. I did not see him in the corridor during the altercation. I did not see the defendant out there during the fight. Don't know what Granville was doing. I know my husband had no knife during the fight, because I saw his hands when they were loosed from each other. I don't know where he got the knife. It was in his hand opened when I first saw it, and this was after we had got him in the courthouse some two or three steps, and stopped. I never told Miss Lou Everett, at Mrs. John King's, the day my husband was buried, that I would not have cared so much for my husband's death if he had not been drinking. If my husband was drinking that night I did not know it. I did not tell Hart Gunnells, the assistant city marshal of Fort Worth, in the courthouse, or anywhere else, that I had been bull-dozed by the Flowers into swearing what I had been swearing in this case, and that I was not going to swear the same thing any more. And I never told him that Vat Taylor did what he did in cutting my husband because he had it to do, nor that what he (defendant) did he done in self-defense, and that both my husband and Granville Flowers jumped on him (de-fendant), and that Vat Taylor cut in self-defense. I made no such state-ments at all. I did have a conversation with Hart Gunnells at about the time and place mentioned, but that conversation was not in reference to this case in any manner, and I did not then or there make any statements about my deceased husband or Vat Taylor. I did have something to say, and said it, about old man Flowers, but that was not in relation to this case or any testimony in it in any manner whatever."

Defendant proposed to introduce H. D. Gunnells, for the purpose of impeaching Mrs. Bessie Flowers, by showing that she had made state-ments to the said Gunnells directly contradictory to her testimony as above set out. The bill of exceptions reserved to the ruling of the court in refusing to allow this impeaching testimony will be found set out be-low, in the opinion of the court.

*F. J. Thurmond* and *J. F. Eidson*, for appellant.—The court erred to the defendant's injury and prejudice upon the trial of this cause, in admitting the dying statement of the deceased, W. H. Flowers, to be introduced and read before the jury as evidence in this cause, over the objection of the defendant as shown by his bill of exceptions number 1.

Appellant's objections were as follows, to wit: That said purported dying statement was hearsay, and that appellant was not present, and had no opportunity to cross-examine the deceased; that said statement was not taken upon the trial of this cause at any time; that said statement was not legal evidence in this cause; that to introduce said statement over the defendant's objection would be, and was, in violation and contravention of the Constitution of the State of Texas, and in violation of the law in this cause, and in violation of the Bill of Rights, and in violation of the Constitution of the United States of America and the Bill of Rights of the United States. That there was no proper and legal predicate laid for the introduction of said purported dying statement; that said deceased was not in his right mind, and was not sane, at the time he made said statement. That said statement was made in reply to interrogatories propounded to him by H. C. Hord, county attorney of Nolan County, Texas, leading his mind up to the particular subject matter testified about; and because said dying statement was not voluntarily made, but was made through persuasions and in reply to interrogatories propounded to him calculated to cause him to make said particular statement, and because deceased was not sane; that he was not in his right mind and was not conscious of the danger of approaching death, and had no hope of recovery at the time he made it; and because, under the law and Constitution of this State, appellant was entitled to be confronted by the witness in the case on the trial, before the court and jury, in flesh and blood, and that said statement was not legal and competent evidence against him upon the trial of this cause, and was prejudical and injurious to appellant before the jury, and that there was other evidence of eyewitnesses to the killing and attainable upon this trial.

The court overruled all the above objections of the appellant and admitted said purported dying statement of the deceased, W. H. Flowers, to be read before the jury as evidence in this cause, to which ruling of the court appellant excepted then and there, and assigned the ruling of the court in admitting this dying statement in the trial of this cause, as error. Cline v. State, 36 Texas Crim. Rep., 320, Judge Henderson's dissenting opinion; sec. 10, Bill of Rights of Const. of Texas; sec. 20, Bill of Rights of Const. of Texas; U. S. Const., sec. —, and Bill of Rights; sec. 29, Const. of Texas; also Locke v. State, 23 Texas Crim. App., 40; 3 Rice on Crim. Ev., sec. 336; U. S. Const., art. 6.

The court erred to appellant's injury and great prejudice before the jury in not allowing H. D. Gunnells to testify before the jury the statement Mrs. Bessie Flowers made to him in the courthouse at Fort Worth, Texas, as shown by bill of exceptions number 2 of appellant. Mrs. Bessie Flowers was the wife of W. H. Flowers at the time he was killed, and

the widow of the deceased, and testified on the trial of this cause, as shown by the bill of exceptions in this cause number 2. She was a very material witness for the State, and was an eyewitness at the fight and homicide, and her testimony was very damaging to the appellant before the jury upon the trial of this cause. She testified upon the trial hereof that her husband, W. H. Flowers, the deceased, was cut and stabbed with a knife, as alleged in the indictment in this cause, and that she was present when he was cut and stabbed, and that her husband, the deceased, never drew his knife, and did not have any knife, open or in his hands, during the difficulty in which he was killed, until after the difficulty was over and he had been taken into the main courtroom at Sweetwater, Texas, and that she saw him take it out of his pocket and open it, and that deceased's brother, Granville Flowers, had no knife seen by her, and that she did not see Granville Flowers during the difficulty, and that her husband was not fighting, and she did not see the defendant E. P. Taylor during the difficulty. The following questions were propounded to her by the defendant's counsel, in the presence of the jury upon the trial of this cause while she was on the witness stand, to wit: Didn't you tell H. D. Gunnells, the assistant city marshal of Fort Worth, Texas, about the last of February or first of March, 1897, in the courthouse at Fort Worth, Texas, just north across the hall from the district clerk's office in said courthouse, that Vat Taylor (E. P. Taylor, the defendant) had this fight in self-defense, and ought to be acquitted, and that you had sworn lies enough for the Flowers against Vat Taylor, or swore lies enough against Vat Taylor; and that they, Granville Flowers and deceased Will Flowers, both jumped on defendant, and what he did was in self-defense, and that you knew enough to acquit him, and was going to swear it on the next trial, and what he did he had it to do? That said witness, Mrs. Bessie Flowers, the wife of deceased, denied talking to said H. D. Gunnells about the defendant's case at all, and absolutely denied that she made any such statements to said witness H. D. Gunnells, but stated she did have a talk with him about that time and place mentioned.

Whereupon the defendant put said witness H. D. Gunnells upon the witness stand, and asked him the same questions propounded to said witness Mrs. Bessie Flowers. Said witness answered she made a part of such statements. The jury being withdrawn by the court from the courtroom, then the witness Gunnells made the following statement to the court, to wit: "On or about the latter part of February, 1897, or some time in March of same year, Mrs. Bessie Flowers sent for me to meet her at the district clerk's office in the courthouse in Tarrant County, Texas. I met her there, at said office, went across the hall north of district clerk's office, and she told me as follows: First, she asked me if I had heard of old man Flowers talking about her. I told her I had not. She said she had been told that he had been talking about her, and that she wanted me to try and find out, if possible, all that he had said; said she was tired of being bulldozed, and she was not going back to the trial unless they sent her a ticket, and that if she did go back she was going to turn Vat Taylor loose;

that he should be turned loose; that he only done what he had to do; that Will Flowers and Granville Flowers were both on him when he cut Will Flowers; and that her testimony on the next trial would turn Vat Taylor loose."

After the above testimony of said witness Gunnells was related to the court, in the absence of the jury, the State's counsel objected to said testimony going before the jury, or being introduced before the jury, because it was conclusions of the witness Bessie Flowers, and not material, and was collateral issues, and did not contradict any statement of the witness Mrs. Bessie Flowers. The court sustained the objection, and refused to allow the said testimony to go before the jury, to which ruling of the court defendant then and there excepted. And defendant then offered to put said interrogatories to said witness Gunnells separately, and asked the court to allow him to do that, as some of the said answers of said witness was admissible. The court refused to allow defendant to do that, and then defendant offered to put the witness Bessie Flowers on the witness stand and ask her the exact questions testified to by the witness H. D. Gunnells, and the court refused to allow it to do that; said it was not material, and did not contradict any testimony of witness Mrs. Bessie Flowers; he would rule it all out; and said witness had "already been on the stand twice, once by the State and once by the defendant, and the court would not allow her to be recalled. Whereupon the defendant excepted to the ruling of the court. 10 Texas Crim. App., 705; 21 Texas Crim. App., 59; Whart. Crim. Ev., 9 ed., sec. 483; Penal Code, sec. 1045, note, and authorities there cited.

The court erred to the great prejudice and injury of this appellant in charging upon the evidence of deceased. It called the jury's special attention to his dying statement, and laid great stress upon his evidence, selecting it from all the other evidence of all the numerous witnesses that testified in this cause, and especially calling the jury's attention to it, gave it more weight with the jury than any other testimony in the case, and was error of the court. Said charge was clearly upon the weight of the evidence, especially this part of the court's charge, to wit: "But in this connection I charge you that it would be no legal objection to said declaration that questions were asked him directing his mind to the subject, or part of the subject, upon which such declaration was based, nor do such questions take from said declaration its voluntary character." Appellant excepted to this part, and all the charge upon dying declaration, as upon weight of the evidence, and not the law in this case. The court, in its charge herein, invaded the province of the jury, it being their province to say in passing upon the evidence, and all the evidence, and especially the dying declaration, whether it was made in reply to interrogatories; if so, it was not admissible. But the court tells them not to consider that question, but takes it from the jury, and settles it; therefore a charge upon the weight of evidence, and misled the jury, and kept said deceased's evidence prominently before the jury, and gave undue weight,

prominence, and credence to said dying declaration, and influenced the jury to defendant's injury and prejudice. Wherefore this cause ought to be reversed and remanded for a new trial.

The court erred to the injury and prejudice of the defendant in charging the jury the law upon provoking a contest. There being no evidence to justify such a charge, it was misleading to the jury. And the court failed to charge the jury upon the affirmative for the defendant if the deceased provoked the difficulty, thereby depriving the defendant of his rights of self-defense.

The court charged the jury, if the appellant provoked the contest with the deceased (W. H. Flowers) with the apparent intention of killing him or doing him some serious bodily harm or injury, that he would be guilty of murder, although he may have done the act of killing suddenly, without deliberation, and in order to save his own life. The law allows no justification in such cases, and no reduction in the grade of homicide below murder. The foregoing charge was error; it was excepted to, raised in the motion for a new trial, and assigned as error. There was no evidence to justify such a charge. Words do not constitute provoking a difficulty, as said by this court in the case of Polk v. State, 30 Texas Criminal Appeals, 659. There was a conflict in the evidence between deceased and his brother, Granville Flowers, on one side, and Pat Boyd, Bob Witt, and Duke Taylor on the other side. Duke Taylor, Pat Boyd, and Bob Witt say that deceased struck appellant as he left and started from deceased, and in the back at that. Now, if it was the law of the case to charge that if the appellant provoked the contest, why wasn't it law for the court to charge the jury that if the deceased provoked the contest, that defendant would be justifiable to fight in self-defense, and use such force and means as were necessary or were apparently so, from his standpoint? We think appellant was entitled to an affirmative charge upon this issue. Polk v. State, 30 Texas Crim. App., 659; Cunningham v. State, 17 Texas Crim. App., 94; 33 Texas Crim. Rep., 591; 34 Texas Crim. Rep., 226.

The court erred to defendant's injury and prejudice in charging the jury, if any other unlawful attack was made upon defendant than the one by deceased, that he must resort to all other means before slaying his assailant. Because if Granville Flowers made an unlawful attack upon defendant with a knife, that would be any other unlawful attack, and under this charge defendant would have to resort to all other means before defending himself.

This charge of the court was misleading to the jury and damaging to the appellant, because under the evidence Granville Flowers made an assault with a knife upon appellant at the same time deceased (W. H. Flowers) did. They both acting together, appellant had the right to act upon the hostile demonstrations of either one of his assailants, and was not required under the law to resort to any other means, but had the right to use any necessary means and force that was the most efficient, in his legal and proper defense. Said charge led the jury to believe that the law was,

if Granville Flowers or anyone else made an attack at the time of this difficulty upon the appellant, with intent to kill or do him serious bodily harm, that he must resort to all other means before slaying the assailant. This was not the law, was misleading to the jury, and did appellant great harm and damage before the jury. Wherefore this cause should be reversed and remanded for a new trial. 20 Texas Crim. App., 665-670; 25 Texas Crim. App., 346; 16 Texas Crim. App., 473; 10 Texas Crim. App., 340.

The court should have granted defendant a new trial on account of the separation of the jury. Brown v. State, 38 Texas, 483; Porter v. State, 1 Texas Crim. App., 399; Early v. State, Id., 248; Grissom v. State, 4 Texas Crim. App., 374; Wright v. State, 17 Texas Crim. App., 152; 18 Texas Crim. App., 576; 22 Texas Crim. App., 570; English v. State, 28 Texas Crim. App., 500; 13 S. W. Rep., 775. There can be numerous other authorities cited, both of Texas and other States, to support this position.

[This brief was also accompanied by an able argument, which can not be reproduced on account of want of space.—Reporter.]

*Mann Trice,* Assistant Attorney-General, for the State.—[No brief found with the record.—Reporter.]

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at ten years confinement in the State penitentiary, and prosecutes this appeal.

Appellant contends that the court committed an error in admitting the dying declarations of the deceased, W. H. Flowers. The first objection urged is that said dying declarations as contained in the written statement were not admissible, because a sufficient predicate had not been laid for their introduction. In this we disagree with counsel for appellant. We think the testimony shows conclusively that deceased was then conscious of approaching death, and had no hope of recovery. And we further disagree with counsel that the same was induced by leading questions calculated to elicit the desired answers. It is true that deceased was at the time partially under the influence of opiates, and had to be aroused from time to time in order to continue his statement. But it does not appear that any statement made was elicited by a question calculated to induce the answer given; and although, during some of the time, he was unconscious, and had to be aroused to continue his statement, yet the same appears to be an intelligent, continuous, and logical statement of how the killing occurred. Appellant further contends that said statement is not admissible as evidence, because it was violative of the constitutional guaranty requiring appellant to be confronted with the witnesses against him, and he refers us to the majority opinion of the court in Cline's Case, 36 Texas Criminal Reports, 320, and, in connection therewith, to the dissenting opinion of Henderson, Judge, in that case. This question has long been settled in this State against the contention of ap-

pellant. See Burrell v. State, 18 Texas, 718, and authorities there cited. And see also Campbell v. State, 11 Georgia, 353. In a case of dying declaration the witness does confront the appellant at the trial. It is true, the witness states the declaration of the decedent as to the cause and manner of his death. This declaration is itself, under the authorities, made original testimony; and it is considered as original evidence, and not hearsay, when given by any witness who may have heard such declaration when made under the circumstances required by law—that is, that the declarant must be conscious at the time of approaching death, and believe that there was no hope of recovery, and that such declaration was voluntarily made, and not through the persuasion of any person, and that the same was not made in answer to interrogatories calculated to lead the deceased to make any particular statement, and that such declarant was at the time of sound mind.

Appellant assigns as error the action of the court in refusing to permit him to impeach Mrs. Bessie Flowers by the testimony of H. D. Gunnells. Said assignment is based upon the following bill of exceptions: "Be it remembered, that upon the trial of this cause Mrs. Besie Flowers, wife of the deceased, W. H. Flowers, a State witness, who testified for the State upon the trial of this cause: That her husband, W. H. Flowers, was cut and stabbed with a knife, as alleged in the indictment in this cause; and that she was present when he was cut and stabbed, and that her husband (the deceased) never drew his knife, and did not have any knife open or in his hands during the difficulty in which he was killed, until after the difficulty was over, and he had been taken into the main courtroom, at Sweetwater, Texas, and then she saw him take it out of his pocket, and open it; and that deceased's brother, Granville Flowers, had no knife seen by her, and that she did not see Granville Flowers during the difficulty; and that her husband was not fighting, and she did not see the defendant, E. P. Taylor, during the difficulty. The following questions were propounded to her by the defendant's counsel, to wit: 'Didn't you tell H. D. Gunnells, the assistant city marshal of Fort Worth, Texas, about the last of February or first of March, 1897, in the courthouse at Fort Worth, Texas, just north across the hall from the district clerk's office in said courthouse, that Vat Taylor (E. P. Taylor, the defendant) had this fight in self-defense, and ought to be acquitted, and that you had sworn lies enough for the Flowers against Vat Taylor, or sworn lies enough against Vat Taylor; and that they, Granville Flowers and deceased, Will Flowers, both jumped on defendant, and what he did was in self-defense; and that you knew enough to acquit him, and was going to swear it on the next trial, and what he did he had it to do?' That said witness Mrs. Bessie Flowers, the wife of deceased, denied talking to said H. D. Gunnells about the defendant's case at all, and absolutely denied that she made any such statements to said witness H. D. Gunnells, but stated she did have a talk with him about that time and place mentioned. Whereupon the defendant put said witness H. D. Gunnells upon the wtiness stand,

and asked him the same questions propounded to said witness Mrs. Bessie Flowers. Said witness answered she made a part of such statements. The jury was withdrawn from the courtroom, and the witness Gunnells made the following statement to the court, to wit: 'On or about the latter part of February, 1897, or some time in March of the same year, Mrs. Besie Flowers sent for me to meet her at the district clerk's office in the courthouse in Tarrant County, Texas. I met her there at said office, went across the hall, north of the district clerk's office, and she told me as follows: First, she asked me if I had heard of old man Flowers talking about her. I told her I had not. She said she had been told that he had been talking about her, and that she wanted me to try to find out, if possible, all that he had said. Said she was tired of being bulldozed, and she was not going back to the trial unless they sent her a ticket; and that, if she did go back, she was going to turn Vat Taylor loose; that he should be turned loose; that he only done what he had to do; that Will Flowers and Granville Flowers were both on him when he cut Will Flowers, and that her testimony on next trial would turn him loose.' After the above testimony of the said witness H. D. Gunnells was related to the court in the absence of the jury, the State's counsel objected to said testimony going or being introduced before the jury, because it was conclusions of the witness Mrs. Bessie Flowers, and not material, and was collateral issues, and did not contradict any statement of Mrs. Bessie Flowers. The court sustained said objections, and refused to allow the said testimony to go before the jury, to which ruling of the court defendant then and there excepted. And then defendant offered to put said interrogatories to said witness Gunnells separately, and asks the court to allow him to do that, as some of said answers of said witness were admissible. The court refused to allow defendant to do that, and then defendant offered to put the said witness Mrs. Bessie Flowers on the witness stand, and ask her the exact questions testified to by said H. D. Gunnells, and the court refused to allow defendant to do that; said it was not material, and did not contradict any testimony of witness Mrs. Bessie Flowers, and he would rule it all out; and said witness had already been on the stand twice—once by the State and once by the defendant— and the court would not allow her to be recalled. Whereupon the defendant excepted to the ruling of the court, and tenders this, his bill, and asks it to be allowed and ordered filed," etc. Now, if it was competent for appellant to impeach Mrs. Flowers, and the proper predicate had not been previously laid, then we think the court should have permitted the re-introduction of Mrs. Flowers, in order to lay the proper predicate after it was ascertained exactly what H. D. Gunnells would testify as to her statements to him. But, if it was not competent to impeach Mrs. Flowers upon the points stated by H. D. Gunnells, then no error was committed by the court in refusing to permit Mrs. Flowers to be introduced for the purpose of laying a proper predicate. So this brings us to the question as to whether Mrs. Flowers could be impeached.

The bill in question is adroitly drawn, and the reading of the first part of the bill would indicate that Mrs. Flowers had testified that she was present when her husband was cut and stabbed, and that her husband never drew his knife, and did not have any knife open or in his hand during the difficulty in which he was killed, until after the difficulty was over; and that he only drew it after he was removed from the room in which the difficulty occurred; and also that Granville Flowers also had no knife during the difficulty; and that her husband was not fighting, and that she did not see the defendant, E. P. Taylor, during the difficulty. This is stated in such a way at the outset of the bill as to make it appear, as stated above, that she was present during the difficulty, and witnessed it. While it is true that the mere statement by her to Gunnells, that she was tired of being bulldozed; that if she went back to the trial they would have to send her a ticket, and that she was going back to turn Vat Taylor (the defendant) loose, and that he should be turned loose, and that he only did what he had to do—not being the relation of any fact in contravention of her assumed testimony, but being merely the expression of an opinion by her, would not be competent. Yet the statements by her to Gunnells that Will Flowers and Granville Flowers were both on him (meaning defendant) when he cut Will Flowers, would be the statement of a fact, and would certainly be competent evidence to impeach her, if the bill shows that she was present at the difficulty, and stated that she witnessed it, and that Will Flowers and Granville Flowers were not on defendant when he cut W. H. Flowers; or if she stated that she was present at the difficulty, and gave an account of how it happened, and that such account was inculpatory of defendant, and antagonistic or in contravention of the idea that W. H. Flowers and Granville Flowers were on top of defendant when he cut deceased, then the impeaching testimony would be admissible. The court, however, certifies as one of the reasons for his refusal to permit the impeaching testimony that it was not in contradiction of any testimony given in by Mrs. Flowers—that is, the bill is self-contradictory—and the court's explanation is not reconcilable with the statement in the beginning of the bill as to what Mrs. Flowers had testified to on the trial, and what it was proposed to be proved by Gunnells she had stated to him in the courthouse at Fort Worth. If we consider that the judge's explanation or modification of the bill has a controlling influence, then this would dispose of the bill. If we recur to the statement of facts, we find that his explanation is eminently correct; that is, Mrs. Flowers did not testify that she was present during the difficulty and witnessed it, nor did she state how it occurred. On the contrary, her testimony showed that she was not present. She did not see or know how the cutting occurred, nor did she pretend to state the particulars of the transaction. According to her testimony, she only entered the room after her husband had been cut and was being taken into an adjoining room, and she did not see the defendant at all. True, she narrates that, after her husband was taken into the other room, he handed his open knife to her; but two other witnesses testify as to appellant getting his knife out

of his pocket, and opening it, and handing it to his wife, after he was taken into the other room, and laid upon the table. This is not gainsaid by any evidence. Mr. Wharton lays down the rule as follows: "A witness called by the opposing party can be discredited by proving that on a former occasion he made a statement inconsistent with his statement on the trial, provided such statement be material to the issue; though a witness, after testifying to criminating facts, can not be asked whether he has not previously said that in his opinion the defendant was not guilty. The statement which it is intended to contradict must involve facts in evidence. If confined to opinion, when opinion is not at issue, or to other irrelevant matters, the cross-examining party is bound by the answer. * * * A witness may also be contradicted by proof of prior contradictory statements before the grand jury, or by proof that he now states facts which, on a former trial, he omitted to state; and generally, whenever on a former occasion it was the duty of the witness to state the whole truth, it is admissible to show that a witness in his statement admitted facts sworn to by him at the trial." See Whart. Crim. Ev., sec. 482. This rule has been followed by our court in a number of decisions. It apprehends that the witness has testified to some material fact about which it is proposed to contradict him; and it presupposes that, if the witness has not testified to the fact, there is no basis for the contradictory evidence. Applying this rule to the testimony of Mrs. Flowers, we find that she did not state a single fact with reference to the fight which resulted in the death of her husband, that she was not present at the time it occurred, and knew nothing as to how it did occur. So there was nothing upon which to contradict her, and the statement proposed to be proved by Gunnells that she theretofore told him at Fort Worth that when defendant cut her husband, that her husband and Granville Flowers were on top of him, not being in contradiction of any testimony given by her on the trial, was not legitimate evidence in impeachment of her; and the court did not err in excluding it.

Appellant contends that the charge given by the court with reference to dying declarations of the deceased, W. H. Flowers, was improper, as being a charge upon the weight of the evidence and giving undue prominence to said witnesses' testimony. We have examined said charge, and, in our opinion, it was merely an instruction to the jury with reference to a rule of law under which they were to determine whether or not they should consider said dying declarations at all. Inasmuch as some controversy was made by appellant as to whether said declarations were freely and voluntarily made, and that the deceased was of sane mind at the time, and conscious of approaching death, the court instructed them that, if said declarations were not made under the safeguards required by law, not to consider same. The charge in question was as follows: "You will not consider the dying declarations of the deceased, W. H. Flowers, unless you believe from the evidence that at the time the said declarations were made that the deceased was of sane mind, conscious of approaching death, and that said statement was made voluntarily, and not in response

to interrogatories calculated to lead deceased to make any particular statement. But in this connection I charge you that it would be no legal objection to said declaration that questions were asked him directing his mind to the subject, or part of the subject, upon which said declaration was made. Nor do such questions take from such declaration its voluntary character." We understand the last portion of said charge as particularly objected to. In our opinion, it embodies a correct rule on the subject, and was applicable to the testimony.

Appellant also objected to the following charge: "You are instructed that, if the defendant provoked the contest with the deceased, W. H. Flowers, with the apparent intention of killing him or doing him serious bodily harm or injury, he would be guilty of murder, although he might have done the act of killing suddenly, without deliberation, and in order to save his own life. The law allows no justification in such cases, and no reduction of the grade of homicide below murder. But, if the defendant provoked the contest without any intention to kill deceased, or to inflict serious bodily harm or injury upon him, and suddenly, without deliberation, stabbed, cut, and killed him, he would be guilty of manslaughter." The contention of appellant is that there was no testimony authorizing this charge. We would remark in this connection that a full and clear charge on self-defense was given, which, in our opinion, adequately guarded the rights of the defendant; and said charge was not trammeled by the charge on provocation being connected therewith. It does not appear from the testimony that any witness except the deceased made any statement as to the circumstances immediately attending the stabbing with the knife. If the dying declarations be true, appellant not only sought and provoked the difficulty, but himself attacked deceased. This declaration first tells about an altercation that had occurred between him and deceased in the room where they were dancing. Some considerable lapse of time after this—an hour or more—deceased walked from the supper-room into the corridor. "There," he says, "I stepped in the door of the courtroom, and saw Vat Taylor in the corridor in the corner next to the ladder. I had my back to him, and he said, 'I think you acted' [and used a very opprobrious epithet towards him], and then stabbed me in the belly with his knife. He made all the wounds in my abdomen before I clinched with him. I think he cut me on the shirt sleeve after we clinched. I never had my knife out at all in the corridor, or while we were scuffling. I got it out after we separated, and came into the court room." Now, this testimony not only justified the court in giving a charge on provoking the difficulty, but would deprive the defendant of self-defense altogether. Nor, in our opinion, does the testimony of any of the other witnesses in the case militate against this evidence. True, two of the witnesses, who were in the courtroom, stated they were sitting on a railing in front of the judge's stand, and looking through the door into the corridor. "Saw deceased come from towards the grand jury room, and lean up against the door-facing. Defendant was at that time leaning against the door-facing on the north side of the door. They stood there

and talked, facing each other, for a minute or two; and then defendant started to walk off towards the head of the stairway. Saw deceased's arm go out in front of him, and in the direction of the defendant." One of these witnesses merely says, "Deceased's arm went out in the direction of defendant," and the other says, "I think he struck at defendant; they seemed to clinch then, and I saw no more, as the crowd rushed up." Taking the testimony of these witnesses, in connection with the testimony of the deceased, showing what this conversation was, and the opprobrious epithets applied to him (deceased) by defendant, if, according to these witnesses, defendant, in response to this insulting language, struck at or struck defendant according to said witnesses, then the court's charge on provoking the difficulty was certainly rendered pertinent. Moreover, in our view, there was no danger of the jury applying the charge of the court to the altercation that occurred in the dance room some hours previous.

Appellant, in this connection, claims that the court, having given a charge on provocation, should have given an alternative charge. The charge given by the court on self-defense we think fairly embodied all of appellant's rights under the testimony in the case. Said charge fully authorized the jury to acquit the defendant if he was first attacked by either the deceased or his brother, Granville Flowers, in such manner as to cause him to apprehend danger to his life, or serious bodily injury. To our minds, indeed, there is very little testimony in the case calling for a charge on self-defense at all. · Although Duke Taylor, the brother of the defendant, was a witness on his behalf he does not state the beginning of this difficulty in such form as to make clear to our minds the appellant's right of self-defense. He says: "When the fight was up, I was walking from the railing over towards the door of the courtroom, and had stopped some eight or ten feet from the door, right opposite to it. The first thing that drew my attention was the motion of the deceased's arm. He struck out in front of him. I did not see his hand, and did not know whether he had anything in it or not. I saw my brother there at the time, and I rushed to the door," etc. Now, he does not state the origin of this difficulty in the corridor, and, according to deceased's version, which is not contradicted by any witness, defendant was the aggressor; brought it on; and if it be conceded that defendant struck him after he had denounced him, he evidently did so for the purpose of bringing on the difficulty, and then cutting him with his knife, for all of the testimony shows that he immediately began to cut him. The testimony further shows that after the altercation in the dance room he must have premeditated this assault, and laid in wait for the deceased some time in the corridor, before he found occasion to attack him, because the brother of the defendant says that he saw his brother out in the hall several minutes before the fight occurred; and other witnesses show that he must have been there, and, as soon as deceased appeared, he denounced him in a violent manner; and whether he or deceased struck the first blow, to our minds, is absolutely immaterial.

There was no error in the court's additional charge to the jury that, if the deceased made any other attack on the defendant than one with intent to kill him or inflict serious bodily injury, before he was authorized to slay deceased he must have resorted to all the other means besides retreating. If he made any attack on him at all, it was an attack less than one to murder or inflict upon him serious bodily injury. Nor did the court commit any error in refusing to give appellant's requested instruction embodying self-defense, predicated on the idea that there was a conspiracy between deceased and others to make an attack on defendant. The testimony utterly fails to show any such conspiracy.

Appellant insists that he should have had a new trial on account of the separation of the jury while they were considering their verdict and that the case should be reversed on account of the refusal of the court to grant such new trial. We have examined the record carefully in this respect, and, while it appears that members of the jury on two occasions were absent from the main body, it appears that during such separation one of the jurors merely went into the hotel with an officer to register off his name, which was only a short distance from where the main body of the jury was, and that he was only absent from them a very short time; that in the meantime the judge, and perhaps another officer, were with the jury. Another one of the jurors left the main body at one time to go to a buggy, in which were his sister and two other young ladies, in order to send a message to his wife. He was then in view of the officer all of the time, and it does not appear that there was any such separation as in anywise would prejudice the rights of the appellant. No error appearing in the record, the judgment is affirmed.

*Affirmed.*

[NOTE.—Appellant's motion and amended motion for rehearing was overruled without a written opinion.—Reporter.]