J. J. Yarbrough v. The State.

No. 7942.   Decided June 20, 1923.

1.—Murder—Dying Declaration—Predicate—Rule Stated.

When there is an issue in regard to the proper predicate for the admission of the dying declaration, it should be submitted to the jury with instructions to disregard the declaration if the issue is found favorable to the defendant. Following Taylor v. State, 38 Texas Crim. Rep., 567, and other cases, and in the instant case, it should have been done, and a failure to do so is reversible error.

2.—Same—Newly Discovered Evidence.

Where, upon motion for a new trial on the ground of newly discovered evidence, the defendant brought himself within the scope of the rule, a new trial should have been granted. .

3.—Same—Impeaching Evidence—Rule Stated.

Ordinarily where impeaching evidence can be appropriated by the jury for no other than impeaching purposes, it will not be held reversible error not to so limit it in the charge, but under the facts in the instant case such a charge should have been given. ·

Appeal from the District Court of Fort Bend.   Tried below before the Honorable M. S. Munson.

Appeal from a conviction of murder; penalty, thirty years imprisonment in the penitentiary.

The opinion states the case.

*I. C. McFarlane,* and *Mathis, Kahn, Heidingsfelder & Teague,* and *E. T. Branch,* for appellant.—Upon question of dying declarations and predicate, Craven v. State, 49 Texas Crim. Rep., 81.

*R. G. Storey,* Assistant Attorney General, for the State.

HAWKINS, Judge.—Appellant is under conviction for murder growing out of the killing of C. H. Thalmann, punishment having been assessed at thirty years confinement in the penitentiary.

Appellant was running a rooming house in the town of Blue Ridge in the oil field in Fort Bend County.   Deceased was rooming at the house.   He owed appellant twenty-eight dollars.   The record leaves it uncertain as to whether it was for borrowed money or room rent, or partly both.   Appellant had made some complaint about deceased not paying him, and Worrell, for whom deceased was working had offered to see that the debt was paid or deceased would be discharged. Deceased had also a few days before the homicide taken to his room a woman of lewd character.   Appellant requested both of them to

leave the house which they did. Appellant said he did not desire to have deceased discharged for failure to pay the debt, but requested Worrell to see him and ask him to leave the rooming house, move his things away and not give appellant further trouble. Evidence was introduced showing that deceased was in the habit of carrying a pistol; that he had made threats to kill appellant, and to run him out of his own house. These threats were made on Friday or Saturday prior to the killing on Sunday. They had been communicated to appellant. No one witnessed the shooting which occurred about nine o'clock on Sunday morning in the lobby of the rooming house.

It was the contention of the State that appellant shot deceased from behind the door of what was called the "junk room" as deceased was going to his room to move his things out, and appellant's theory was that deceased had called appellant and undertook to carry into effect the previous threat to run appellant out of his own house and had attempted to draw his pistol, whereupon he was shot by appellant in self-defense. Immediately after the shooting roomers in the house appeared on the scene and other parties came in from the outside. Deceased was lying on the floor with a pistol at his side. As these parties came into the room appellant, who was present with a shotgun in his hand, told them that deceased had undertaken to run him out of his house and had drawn a pistol on him. Deceased replied to these statements of appellant in vigorous language to the effect that he was telling a lie about the matter; that he (deceased) never dreamed of trying to draw his pistol, but that appellant shot him from the door of the junk room and that deceased's pistol had fallen out as he fell to the floor. Appellant introduced evidence that deceased's reputation was bad as being a violent and dangerous man, and one who would likely carry into execution a threat previously made. This was controverted by the State. The foregoing we deem a sufficient statement of the facts to make pertinent the matters hereafter discussed.

The State introduced in evidence a dying declaration of deceased. The court did not submit to the jury the issue as to whether a proper predicate had been laid for its reception. The charge was excepted to for such omission and a special charge requested supplying it. The bill of exception presenting the point is qualified by the learned trial judge in the following statement:

"The court admitted the statement originally believing that a proper predicate was proven, by the State to admit same, and did not submit the issue to the jury for the reason that there was no controverted issue of fact to submit, but all the facts and circumstances shown and testified about showed conclusively to the court's mind that the statement was in compliance with the law.

"Further at the time the exception to the charge was taken and

special charge requested substantially the same facts contained in the statement had been admitted without objection in the res gestae statement of the deceased made immediately after the shooting in the presence of the defendant as is fully shown in statement of facts which is here referred to and made a part of this qualification.''

To determine whether the court was correct in his conclusion that ''there was no controverted issue of fact to submit'' we condense the evidence upon the subject. An ambulance was called from the city of Houston to Blue Ridge for the purpose of taking the wounded man to the sanitarium. They reached Blue Ridge some time after ten o'clock and it took from twenty-five to thirty-five minutes to drive from there to Houston to the sanitarium which they reached about eleven o'clock. Mr. Browning, one of the ambulance drivers, testified on direct examination as follows:

''With reference to what his condition was when I got to Blue Ridge, well, he was still alive but seemed to be out of his head; didn't talk any that I heard; just kept hollering to do something for him and that was all he said when we were taking him to the hospital kept asking me to do something for him. We took him to the treatment room at the hospital and left him there.''

On cross-examination he said:

''Yes, sir, I was driving the ambulance that took him to Houston. I helped put him in and take him out. I said that he seemed to me to be out of his head at that time; didn't seem to know what he was doing, kept, saying to do something for him to ease him. I didn't see them giving him any dope at that time. I just stayed with him at the infirmary long enough to put him on the table and the nurse arrived and I left.''

Mr. Banks, the other driver, testified that he helped take the wounded man to the operating room and stayed there only about ten minutes and did not see him any more until after his death. He died a little after twelve o'clock. Testifying with reference to deceased's condition at the time he reached the sanitarium the witness sad:

''Yes, sir, I helped take Mr. Thalmann in to the operating room. While I was present, the nurse and doctor and Mr. Browning were there. With reference to whether they gave him any dope or anything of that kind—they gave him something; he was begging for something and they give him a shot—they shot a hypodermic needle in his arm—I don't know whether it was dope they gave him or not. The doctor did that. He was asking and begging for something to quiet him. He did not seem to be out of his head at the time. All he was saying was just to do something for me; he was dying; he talked very reasonable; the nurse asked him his name and he told her and his address and what church he belonged to and such as that. He asked the doctor to shoot him. I saw the doctor give him something but don't know what it was.''

The witness who made the memoranda of the dying declaration was B. A. Denny. T. B. Lewis was Assistant District Attorney at Houston and Denny, at Lewis' request, accompanied him to the hospital. Denny testified that Thalman was conscious and was of sound mind at the time and knew what he was doing. Upon the pivotal point at issue his testimony is as follows:

"It was not necessary to take it (the statement) in shorthand. No sir, I didn't ask him any questions; Mr. Lewis asked him who he was and he asked him who shot him. I don't believe he asked him anything else; I believe that is all he asked him. He did not ask him anything about his church or anything like that, and he did not ask him anything about his condition or anything of the kind. Those are the only questions I recall him asking, and this man went on and made those other statements brokenly. When he made the statments, I did not take just the substance of them—Those are almost the exact words; I took them while he was making them. I could write it as fast as he talked. At that time he had not received any morphine that I know of. When I got there, yes, there was a doctor there and a nurse was there. * * * From what he said I don't think that he had gotten any dope or anything of that kind at that time. * * * No he did not say anything about shooting him or giving him anything—just hollering. I believe he did holler and ask why didn't they give him something or something like that. During the time he was making this statement he was hollering also. No, sir, nobody asked him if he felt like he was going to die. * * * I don't recall if Mr. Lewis asked him if he wanted to make a statement * * * It must have been about 11:10 when the call came and about 11:20 when we got there. We stayed there until the man died, and I suppose he died thirty-five or forty minutes from the time we got there. He died ten or fifteen minutes after the statement was made. With reference to whether he was sinking pretty fast,—well, he seemed to be pretty bad off. He did not have any impediment in his talking—like blood, etc. This was all he had to say, this right here. I did not ask him any questions at all."

The declaration introduced in evidence follows:

"My name is Herbert Thalmann, I live at Vandera County, Not Catholic—Christian thats all. Old Man Yarbrough—Jim Yarbrough shot me. I was moving he shot me—he just shot me I was moving my stuff and he got behind door and shot me, shot me twice. Hombre I am going to die ain't I—I think I am. I fell and he shot me again."

Denny, being further interrogated, said:

"With reference to how come him to say 'not Catholic—Christian thats all,' as I recall it, there was either a nun or a doctor standing there and they asked him what his religion was and that is what he answered. Yes, sir, there was a Mexican in there 'Hombre I am going to die ain't I, I think I am,' he was speaking to the Mexican

then, the Mexican was covering him up. I imagine that he died within ten or fifteen minutes after he got through making that statement. This Mexican didn't say anything to him; didn't ask him any questions at all; just covered him up; he was conversing with the Mexican at the time, and he was either conversing with the nun or the doctor when he was making the declaration about his religion. I had my back turned at the table. The Doctor never asked him any questions unless it was this question; it was either the nun or the doctor that asked him that; they were both present. The way it is written is the way it was spoken and it seems to be a little bit disconnected—he would say something and then stop—seemed like he was suffering greatly. His mind would jump from one thing to another, he would open his eyes and see somebody there and then start talking to them. From the time I got there into the room, from then on, he seemed to be in a pretty bad shape. He was hollering and kicking the cover off all the time.''

The serious question, we think, is the mental status of deceased at the time the statement was made. Appellant offered no evidence upon the issue, all the facts heretofore detailed being elicited from witnesses called by the State. It will be observed that neither the doctor in attendance or the nurse were interrogated, nor was Mr. Lewis, the assistant district attorney. Surely the physician, who administered the hypodermic, or the nurse, could have thrown light on the condition of deceased's mind. He was suffering from many wounds. Seven buck shot had gone through his right arm, shattering the bone. Eleven had entered the left shoulder, lodging in the lower part of the lungs. Some two hours had elapsed since he was shot.

When there is an issue in regard to the proper predicate for the admission of the dying declaration it should be submitted to the jury with instructions to disregard the declaration if the issue is found favorable to the defendant. Taylor v. State, 38 Tex. Crim. Rep., 567, 43 S. W. Rep., 1019. (For other authorities, see Section 1870, Branch's Ann. P. C.) If there is testimony sufficient to show a predicate and testimony attacking its sufficiency, it is proper to submit the issue. Martinez v. State, 56 S. W. Rep., 58; McCorquodale v. State, 54 Tex. Crim. Rep., 356, 98 S. W. Rep., 879; Hunter v. State 59 Tex. Crim. Rep., 454; 129 S. W. Rep., 125. However if the testimony as to a proper predicate is conclusive and there is no evidence attacking its sufficiency, in other words, if no issue is raised, it is not necessary to submit it. Cornell v. State, 45 Tex. Crim. Rep., 161, 75 S. W. Rep., 512. It is immaterial whether the issue be raised by direct proof offered by the defense, or whether it develops from the State's evidence alone; it may arise from the facts surrounding the making of the declaration, or from the nature of the declaration itself. No one asked deceased if he wished to make any statement. He had no knowledge that one was being taken. There

was no effort on his part to concentrate his mind on the matter. The testimony of Denny that he would jump from one thing to another, and make disconnected statements is borne out by the declaration itself. From the testimony of one witness that during the journey to the hospital deceased appeared to be out of his head, the entire setting of the circumstances, the actions and words of deceased while making the statement, and from the disconnected statement itself, we are of opinion an issue was raised as to whether the declaration was made under such circumstances as made it receivable in evidence, and that the question should have been submitted to the jury under appropriate instructions. If proper to consider it the matter was important to the State; if improper its effect was seriously injurious to appellant. The State was relying on the physical facts as disputing appellant's version of the homicide, and upon the res gestae statements of deceased. The declaration made by him at the hospital was confirmatory of his former res gestae statements and antagonistic to appellant's evidence.

If we properly comprehend the record another serious question is presented. Appellant claimed that deceased undertook to run him out of his own house, attempting to draw a p stol. It was the contention of the State that deceased was practically shot from ambush while he was going to his room to remove his things therefrom in accord with a former request from appellant to do so. At the time of the killing Tillman Hemphill was a roomer in the house and appellant made inquiry of him as to what knowledge he had of the homicide and was told by the witness that he knew nothing about it. It now appears from affidavits attached to the motion for new trial that not only Hemphill was in the hotel at the time, but that a man by the name of Sanders had occupied the room with him during the night. He and Sanders both make affidavits that they saw deceased coming toward the rooming house from the outside toilet; that immediately after he entered the back door they heard loud talking and heard deceased address appellant by an approbrious epithet, saying: ''I am going to run you out of your house,'' and heard appellant reply, ''Don't do that;'' that this conversation was followed immediately by two shots. The affidavits of Sanders, Hemphill, appellant and his attorney are all to the effect that neither appellant or his attorney knew of these matters until after the trial. Hemphill says in his affidavit that at the time appellant asked him about it he told him he knew nothing about the case. Appellant was thus disarmed and made no further inquiry. He thereby failed to ascertain that not only Hemphill but Sanders were present and knew facts which were vital to appellant's defense. Appellant seems to have brought himself within the rule of newly discovered evidence with reference to these two witnesses.

Willis Morgan testified that he knew deceased's reputation for

being a violent and dangerous man was bad. Upon cross-examination he admitted that shortly after the shooting of Thalmann he had signed a letter in which the statement was made that "We have known him to be a quiet reserved man, a man who you could trust implicitly, and would be glad to call him your friend in every sense of the word a true friend implies."

It developed before the jury that the letter containing this expression was a letter which had been passed around and signed by Morgan and other parties and sent to the mother of deceased for her consolation shortly after the killing of her son. The expressions therein contained were in direct conflict with the testimony of Morgan upon the trial and were admissible for the purpose of impeaching him; but it developed before the jury that parties other than Morgan had also signed this letter. The court's charge did not contain any limitation on the purpose for which the expressions in the letter were admitted; that is, for the purpose of impeaching the witness Morgan. The charge was excepted to for such omission. Impeaching testimony had also been offered as to another witness, to-wit: Betty Evans, and the exception related to both her and Morgan. A special charge was requested limiting the purpose of such impeaching evidence. Ordinarily where impeaching evidence can be appropriated by the jury for no other than impeaching purposes it will not be held reversible error not to so limit it in the charge; but it having become known to the jury that the letter containing the impeaching statements was a letter circulated and signed by other parties than Morgan there was danger that the jury might accept the statements therein disclosed upon the issue of Thalmann's reputation. Upon another trial this evidence should be limited to the purpose for which it was admitted.

. For the errors discussed the judgment must be reversed and the cause remanded.

*Reversed and remanded.*

PRESIDING JUDGE MORROW not sitting.