Antonio GONZALES, Appellant,

v.

The STATE of Texas, Appellee.

No. 365–90.

Court of Criminal Appeals of Texas, En Banc.

Sept. 18, 1991.

Rehearing Denied Nov. 20, 1991.

Larry Zinn, San Antonio, for appellant.

Fred G. Rodriguez, Former Dist. Atty., Mary Roman, Diana Cruz, Barbara Hervey, Asst. Dist. Attys., San Antonio, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON THE STATE'S PETITION FOR DISCRETIONARY REVIEW

McCORMICK, Presiding Judge.

The issue in this case concerns the constitutional rights of appellant, Antonio Gonzales, to confront a ten year old witness at his trial for murder. The child, secured in a room away from appellant, testified via a closed-circuit television system. Appellant insists that such violated rights guaranteed him under the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Texas Constitution. The Court of Appeals agrees with appellant and has reversed his conviction. *Gonzales v. State*, 784 S.W.2d 723 (Tex.App.—San Antonio 1990). We granted the State's peti-tion to review the Court of Appeals opinion and will now reverse.

## I.

### FACTUAL BACKGROUND

On August 29, 1987, paramedics were called to the home located at 3800 South Zarzamora in San Antonio. There they found the body of five year old Yvette M___ wrapped in a sheet on the living room sofa. Upon conducting an initial examination, the paramedics discovered that the child was "very thin with a bloated stomach," and that she was unkempt—paramedics described her as "filthy" and observed that she had head lice. The child's body was covered with bruises and abrasions; there were lacerations on her head. This aroused the paramedics' suspicions and they called the police.

When the police arrived they started their investigations by talking to Yvette's mother and the mother's live-in boyfriend, appellant. Both the mother and appellant told investigators that the child had fallen in the bathroom while taking a shower. The police tried to interview Yolanda, the deceased's sister, but she would only cry; there were visible "old injuries" on her face.[1] Subsequent investigations, including an autopsy which revealed the child had died as a result of acute trauma to the head[2] and the search of the home and seizure from the adult's bedroom of a three-foot long wooden club with human blood on it, lead to the indictment of both the mother and appellant for Yvette's death. On June 28, 1988, appellant's trial on the merits began.

---

1. Apparently the other children in the home were too young and incapable of being interviewed. Because of the visible injuries on Yolanda's face and the death of Yvette, the surviving children were taken into custody.

2. At trial, the doctor who performed the autopsy on the child testified that "because of the number of injuries" she had to separate the child's wounds into three categories: "very acute" (those injuries occurring within a twenty-four to forty-eight hour period); "subacute" (those which were about a week old); and "remote" (those which were over a month old). She described Yvette's injuries as:

"The very acute injuries were those to the head, which resulted in a large amount of swelling of the brain, which caused her death. There were also very acute contusions to the upper and lower extremities, such as the slides show; also, to the back of both hands were recent bruises.

"The subacute or healing type of injuries were the injuries to the frenulum, to the mouth, the injury to the undersurface of the chin, and the incomplete amputation to the tip of the forefinger of the left hand.

"The evidence of older injuries would be all the scattered scars, mostly to the face, head and chest."

Prior to any testimony being heard by the jury, the State moved to present the testimony of Yolanda M——, via closed-circuit television. The motion purported to be based upon Sections 3 and 4, of Article 38.071 of the Texas Code of Criminal Procedure.[3] After conducting a "hearing" the trial court judge granted the State's motion on June 28, 1988.[4] Thereafter, the State began its case in chief but did not call Yolanda to testify. The trial was recessed before the child testified.

That very next day, June 29, 1988, the Supreme Court issued its opinion in *Coy v. Iowa*, 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988). Perceiving conflicts between the *Coy* decision and the manner in which the trial court granted the State's first motion, the State on June 30, 1988, filed a second motion to have the child testify via the closed-circuit system and therein alleged the following:

"Comes now the State of Texas, through her legal representative the Criminal District Attorney for Bexar, County, Texas, and moves the court pursuant to Article 38.071 Sec 3, and 4, of the Texas Code of Criminal Procedure, to order that the testimony of Yolanda M——, a child be taken in a room other that (sic) the courtroom, and be televised by closed-circuit equipment in the courtroom to be viewed by the Court and the finder of fact in the proceeding in the above styled and numbered cause for the following reasons:

"1. Yolanda M——, age 10, is the stepdaughter of [appellant] in the above styled and numbered cause. The [appellant] is charged with the murder of Yvette M——, 5 years old. Yvette M—— and Yolanda M—— were sisters.

"2. Yolanda M—— is the complainant in 88CR1402, Aggravated Sexual Assault; the defendant in that cause is Antonio Gonzales, the same defendant in the above styled and numbered cause.

"3. The above styled and numbered cause occurred August 29, 1987. The Aggravated Sexual Assault 88CR1402 also occurred August 29, 1987.

"4. Yolanda M—— is currently undergoing psychological counseling because of the trauma of seeing her sister, Yvette, beaten with a club about the head and immediately afterwards, seeing Yvette sexually assaulted by the defendant, Antonio Gonzales, on August 29, 1987.

"5. The child, Yolanda M——, is very intimidated by the defendant, Antonio Gonzales and fears that he will kill her for telling what occurred on August 29, 1987."

There was a hearing on the State's second motion after the State presented to the jury all of its evidence except the testimony of Yolanda. At that hearing the State

---

**3.** In 1983, the Legislature enacted Article 38.071, V.A.C.C.P., which provided in five sections for the taking of a child's testimony who is a victim of an offense. Since its enactment, the Article has gone through several alterations—some in response to two decisions from this Court finding Sections 2, 4 and 5 facially unconstitutional. See *Long v. State*, 742 S.W.2d 302 (Tex.Cr.App. 1987), cert. denied, 485 U.S. 993, 108 S.Ct. 1301, 99 L.Ed.2d 511 (1988), *overruled by Briggs v. State*, 789 S.W.2d 918 (Tex.Cr.App.1990). See also *Powell v. State*, 765 S.W.2d 435 (Tex.Cr. App.1989). In its current form, Section 3 provides:

"The court may, on the motion of the attorney for any party, order that the testimony of the child be taken in a room other than the courtroom and be televised by closed-circuit equipment to be viewed by the court, the court reporter and the finder of fact in the proceeding. Only the attorneys for the defendant and the State, persons necessary to operate the equipment, and any person whose presence would contribute to the well-being of the child may be present in the room during his testimony. Only the attorneys may question the child. Any person necessary to operate the equipment shall be confined to an adjacent room or behind a screen or mirror that permits them to see and hear the child during his testimony, but does not permit the child to see or hear them. The court shall permit the defendant to observe and hear the testimony of the child in person, but the court shall ensure that the child cannot hear or see the defendant. On the application of the attorney for the defendant the court may recess the proceeding before or during cross-examination of the child for a reasonable time to allow the attorney for the defendant to confer with the defendant."

**4.** The hearing was nothing more than the attorney for the State arguing why the closed-circuit system was needed and the attorney for the defense lodging objections to the procedure. No testimony was heard.

called Irma Alvarez, who was employed with the Family Violence Unit of the District Attorney's Office, and Janie Ramos, the child's grandmother, to testify outside the presence of the jury.[5] Both witnesses substantiated the allegations in the State's second motion.

Specifically, Alvarez testified that it was her job with the District Attorney's Office to prepare child witnesses for trial by getting them comfortable with the new surroundings of the courtroom. She first talked with Yolanda when the child came to the office for an interview. Although it was out of the ordinary for Alvarez to take the statements of the child witnesses—this being the job of the investigators—she actually conducted the interview with Yolanda after the male investigator determined that he would not be able to get the child to talk with him. Alvarez explained:

"Usually, it is the investigator's position to take those statements. But ... Yolanda was very traumatized, and the investigator was a male; and she felt very uncomfortable talking with him. She was crying the entire session he was there in the room with her, so he asked me if I would talk to her; and I talked to her for about two hours. And I came to realize that she was very frightened of men."

Alvarez began meeting with the child about two months prior to the trial and continued to do so on a weekly basis. These sessions lasted for about an "hour and a half or two." During the last two weeks prior to trial Alvarez spent "about four to six hours on a daily basis" with the child. Yolanda told Alvarez that appellant began sexually assaulting her when she was eight years old and that the last assault occurred the morning of her sister's death. Alvarez testified that "the mere mention of having to testify against the defendant made [Yolanda] cry very much,"

and that Yolanda was unable to be in any room where there was a male present. She testified that "it would hurt [Yolanda's] emotional stability more than it has been hurt already if she was to confront the defendant once again." The child was undergoing counseling.

The grandmother testified that Yolanda has been staying with her since Yvette's death. She testified that Yolanda has suffered emotionally from the incident. She has had nightmares and wakes up in the night screaming. She does not eat. The child will not go into the bathroom alone and does not wish to take a bath by herself. Initially, Yolanda saw a male doctor for counseling. She, however, was afraid of him and a female doctor began treatment. The grandmother testified that Yolanda was afraid of appellant "[b]ecause he told her that he was going to get out very quick and that he was going to take her so she wouldn't say anything." She testified that appellant has threatened to kill the child. Because of all of the events in Yolanda's life, the grandmother believed that if the child were forced to testify in the same room as appellant, such would hurt her emotionally.

After hearing this testimony, the trial court, over appellant's objections, once again granted the State's motion and allowed Yolanda to testify via the closed-circuit television system. The judge entered the following findings of fact:

"1. On June 30, 1988, a pre-trial hearing was held on the State's Motion to Use Closed Circuit Television Equipment, pursuant to Article 38.071 of the Texas Code of Criminal Procedure.

"2. The State proposed to present the testimony of a child witness through closed circuit television equipment situated in the 186th District Court and a

---

5. An employee with the Data Point Corporation, which was responsible for installing the closed-circuit system, also testified. He told the court how the system would work and what would be televised over the monitors that were to be placed in the court room and the room where the child was located. According to his testimony the child would be able to see and hear the State's attorney when she was asking the ques-

tions and the defense attorney *along with appellant* when they were asking the questions. (When the child testified, the prosecutor asked her to identify appellant. Yolanda did so, saying that he was wearing a blue shirt.) Yolanda would not be able to see the jury or the judge but everyone in the courtroom would be able to see and hear her.

remote location within the District Attorney's Office.

"3. The system consisted of two-way audio and video closed circuit system which allowed the child to observe the defendant while she testified from a remote location and further allowed the defendant to simultaneously observe the child while she testified.

"4. The State presented the testimony of a[n] expert technician who detailed the workings of the system.

"5. In support of its motion the State argued a particularized need and a compelling state interest in the protection of child witnesses who are too traumatized by the prospect of testifying in the same room as the defendant.

"6. The State presented the testimony of a child advocate, employed with the Bexar County District Attorney's Office, Family Violence Unit, whose main duty is to prepare children to testify in the courtroom. The witness stated she was well-acquainted with the child and with the facts of this particular case. She unequivocally stated that through many hours of observation and interaction with the child witness she observed the ten-year-old girl to be very traumatized, very distraught, very frightened of the defendant, was intimidated by him and that the child was undergoing counseling. This witness specifically stated that there was a great need to present the testimony of this child witness from another room other than the one in which the defendant would be present.

"8. The State presented the testimony of the child witness' grandmother with whom the child has resided since the incident resulting in defendant's trial herein. She stated that the child has been suffering a great deal, has had nightmares, fears being alone, has been undergoing counseling, that she is not well, and that it would hurt the child emotionally to testify in the courtroom in the presence of the defendant. She further stated that it was her opinion that the child would be unable to testify with the defendant present."

The trial court then concluded that as a matter of law:

"1. The closed-circuit system was necessary to further the essential state interest in the protection of this child witness.

"2. The presence of an intimidation factor and severe trauma to this child witness created the necessity of presenting her testimony via closed-circuit equipment.

"3. The two-way closed-circuit system employed by the State did not offend the defendant's right to confrontation of witnesses against him ... and was within the holding of the United States Supreme Court's decision of *Coy v. Iowa* ...."

Yolanda testified before the jury that on a Saturday morning appellant came into the living room where she and her sister were watching cartoons. Appellant took her little sister into the bathroom. She waited outside the bathroom door where she was able to see inside. Yolanda observed appellant strike her sister on the back and in the head with "a bat." When appellant noticed Yolanda watching, he called her into the bathroom. Appellant forced Yolanda to hold Yvette's hands while he repeated the beatings. When he finished battering the child, appellant put Yvette on the toilet and sexually assaulted her while Yolanda watched. Appellant then got a sheet, wrapped Yvette in it and dragged her body out of the bathroom. Yolanda testified that appellant then made her and her younger brother clean up the blood that had splattered on the floor and walls. Appellant told Yolanda that if she ever told anyone what had occurred he would kill her. After being examined by the prosecuting attorney, appellant's attorney cross-examined Yolanda.[6]

## II.

### FEDERAL LAW

In *Coy v. Iowa*, four Supreme Court Justices believed that "the Confrontation

---

**6.** We have reviewed the tape and note here that the child's facial expressions and demeanor are clearly visible to the viewer. She is seated in a chair and most of her body can be seen. Alva- rez is seated next to the child; she remains silent throughout the examination and cross-examination.

Clause [of the Sixth Amendment to the United States Constitution] guarantees the defendant *a face-to-face meeting* with witnesses appearing before the trier of fact." 487 U.S. at 1016, 108 S.Ct. at 2800 (emphasis added), citing *Kentucky v. Stincer*, 482 U.S. 730, 748, 749–750, 107 S.Ct. 2658, 2669–2670, 96 L.Ed.2d 631 (1987) (Marshall, J., dissenting). However, two members of the Court who joined in the ultimate holding of the *Coy* opinion—that in that case the procedure of placing a screen between the accused and the child witnesses while the children testified before the jury violated the accused's Sixth Amendment rights— refused to conclude that the Confrontation Clause always required a "face-to-face" encounter between the witness and the accused.[7] Justice O'Connor writing for the concurrence agreed that the accused's rights under the Confrontation Clause "were violated in this case." 487 U.S. at 1022, 108 S.Ct. at 2803. Nevertheless, in her opinion "[Sixth Amendment] rights are not absolute but rather may give way in *an appropriate case* to other competing interests so as to permit the use of certain procedural devices designed to shield a child witness from the trauma of courtroom testimony." Id., (O'Connor, J., joined by White, J., concurring) (emphasis added). Two terms later, a majority of the Court did find such "an appropriate case."

In *Maryland v. Craig*, —— U.S. ——, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990), Justice O'Connor, now writing for the majority of the Court, determined that Maryland's statutory procedure allowing for the use of a one-way closed-circuit television system for the receipt of testimony by a child was not violative of the Sixth Amendment's Confrontation Clause.[8] The *Craig* majority determined that "[a]lthough face-to-face confrontation forms 'the core of the values furthered by the Confrontation Clause,' " —— U.S. at ——, 110 S.Ct. at 3164, 111 L.Ed.2d at 679, quoting *California v. Green*, 399 U.S. 149, 157, 90 S.Ct. 1930, 1934–1935, 26 L.Ed.2d 489 (1970), such "is not the *sine qua non* of the confrontation right." Id., citing *Delaware v. Fensterer*, 474 U.S. 15, 22, 106 S.Ct. 292, 295, 88 L.Ed.2d 15 (1985) (per curiam opinion); *Ohio v. Roberts*, 448 U.S. 56, 69, 100 S.Ct. 2531, 2540, 65 L.Ed.2d 597 (1980); *Davis v. Alaska*, 415 U.S. 308, 315–316, 94 S.Ct. 1105, 1109–1110, 39 L.Ed.2d 347 (1974); *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965); *Pointer v. Texas*, 380 U.S. 400, 406–407, 85 S.Ct. 1065, 1069, 13 L.Ed.2d 923 (1965); 5 Wigmore, *Evidence* § 1395, p. 150 (Chadbourne rev. ed. 1974). The majority specifically held that:

> "Given the State's traditional and transcendent interest in protecting the welfare of children and buttressed by the growing body of academic literature documenting the psychological trauma suffered by child abuse victims who must testify in court, we will not second guess the considered judgment of the Maryland Legislature regarding the importance of its interest in protecting child abuse victims from the emotional trauma of testifying. Accordingly, we hold that if the State makes an adequate showing of necessity, the state interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify use of a special procedure that permits a child in such cases to testify at trial against the defendant

---

**7.** The *Coy* Court "le[ft] for another day ... the question whether any exceptions exist" to the "irreducible literal meaning of the Clause: 'a right to *meet face-to-face* all those who appear and give evidence *at trial*.' " 487 U.S. at 1021, 108 S.Ct. at 2803 (emphasis in the original), quoting *California v. Green*, 399 U.S. 149, 175, 90 S.Ct. 1930, 1944, 26 L.Ed.2d 489 (1970) (Harlan, J., concurring).

**8.** Pursuant to the Maryland statute, the trial court must first find that testimony by the child in the courtroom will result in the child suffering "serious emotional distress such that the child cannot reasonably communicate." If so found, the child, the prosecutor, and the defense attorney withdraw to another room where the child is examined and cross-examined. The judge, the jury and the defendant remain in the courtroom where the child's testimony is televised via a closed-circuit one-way television system. The child cannot see the defendant but the defendant can see the child and remains in electronic communication with his counsel throughout the procedure. Objections are made and ruled on as if the witness were in the courtroom. See Maryland Courts & Judicial Procedure Code Annotated § 9–102 (1989).

in the absence of face-to-face confrontation with the defendant." —— U.S. at ——, 110 S.Ct. at 3168–3169, 111 L.Ed.2d at 685 (citations omitted).

The Court emphasized, however, that the finding of "necessity" must be on a case by case basis. "[T]he trial court must hear evidence and determine": *First,* "whether use of the one-way closed-circuit procedure is necessary to protect the welfare of the particular child witness who seeks to testify." —— U.S. at ——, 110 S.Ct. at 3169, 111 L.Ed.2d at 685, citing among other cases, *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 608–609, 102 S.Ct. 2613, 2621, 73 L.Ed.2d 248 (1982). *Second,* the trial court must also find "that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant." Id., citing *State v. Wilhite,* 160 Ariz. 228, 772 P.2d 582 (App. 1989); *State v. Bonello,* 210 Conn. 51, 554 A.2d 277 (1989); *Commonwealth v. Ludwig,* 366 Pa.Super. 361, 531 A.2d 459 (1987).[9] *Third* and finally, the trial court must determine that the emotional distress suffered by the child witness in the presence of the defendant is "more than de minimis, i.e., more than mere nervousness or excitement or some reluctance to testify." Id.[10] If the trial court makes these three findings, then "the Confrontation Clause does not prohibit the use of a procedure that, despite the absence of face-to-face confrontation, ensures the reliability of the evidence by subjecting it to rigorous adversarial testing and thereby preserves the essence of effective confrontation." —— U.S. at ——, 110 S.Ct. at 3169, 111 L.Ed.2d at 686. The *Craig* Court observed that the "rigorous adversarial testing" was accomplished in the case before it through the child (1) testifying under oath, (2) being subjected to full cross-examination and (3) being observed by the judge, the jury and the defendant. See —— U.S. at ——, 110 S.Ct. at 3170, 111 L.Ed.2d at 686.

## III.

### STATE LAW

Although the issue was not raised and argued by appellant in his brief before the Court of Appeals, that Court decided that the Texas Constitution provided for "face-to-face" confrontation. *Gonzales,* 784 S.W.2d at 727 ("we do not find that *Coy* differs that much from earlier decisions reached under TEX.CONST. art. I, § 10") (dicta), citing *Kemper v. State,* 63 Tex. Crim. 1, 138 S.W. 1025, 1029 *overruled by Robertson v. State,* 63 Tex.Crim. 216, 142 S.W. 533, 546 (1911). The State takes issue with this finding. The State points out that "if there has been cross-examination there has been confrontation." State's Brief on the Merits at p. 41, quoting from *Long v. State,* 742 S.W.2d 302, 306 (Tex.Cr. App.1987)[11], cert. denied, 485 U.S. 993, 108 S.Ct. 1301, 99 L.Ed.2d 511 (1988), *overruled by Briggs v. State,* 789 S.W.2d 918 (Tex.Cr.App.1990). The State reasons that because in this case there was cross-examination there was compliance with Article I, Section 10 of the Texas Constitution. We agree.

In *Long* this Court suggested that the State Constitution afforded greater confrontational rights than those afforded un-

---

**9.** The *Craig* Court explained that the need for the second finding by the trial court was because:

"Denial of face-to-face confrontation is not needed to further the state interest in protecting the child witness from trauma *unless it is the presence of the defendant* that causes the trauma. In other words, if the state interest were merely the interest in protecting child witnesses from courtroom trauma generally, denial of face-to-face confrontation would be unnecessary because the child could be permitted to testify in less intimidating surroundings albeit with the defendant present." —— U.S. at ——, 110 S.Ct. at 3169, 111 L.Ed.2d at 685 (emphasis added).

**10.** Here the Court was not willing to decide precisely what would suffice to meet this "more than a *de minimis* " standard. It noted that in the case before it, however, the standard established by the Maryland Statute whereby there must be a finding that the child will suffer serious emotional distress such that the child cannot reasonably communicate "clearly suffices to meet constitutional standards." —— U.S. at ——, 110 S.Ct. at 3169, 111 L.Ed.2d at 685.

**11.** This Court decided the issues regarding the defendant's right to confrontation in *Long* based upon "independent" State grounds. *Long,* 742 S.W.2d at 323 n. 22.

der the Federal Constitution. 742 S.W.2d at 309 n. 9.[12] Nevertheless, the State Constitution has *never* required that the accused and the witnesses against him come "face-to-face" in the trial court in all situations. See, e.g., *Porch v. State*, 51 Tex. Crim. 7, 99 S.W. 1122, 1124 (1907); *Kerry v. State*, 17 Tex.App. 178, 182–183 (1884); *Greenwood v. State*, 35 Tex. 587, 590–592 (1872).[13] In fact, we have interpreted the State and Federal Constitutions as not requiring any type of confrontation (much less "face-to-face" confrontation) between certain hearsay declarants and the accused at trial. See, e.g., *Porter v. State*, 578 S.W.2d 742, 745 (Tex.Cr.App.1979); *Coulter v. State*, 494 S.W.2d 876, 881 (Tex.Cr. App.1973); *Heflin v. State*, 274 S.W.2d 681, 684 (Tex.Cr.App.1955); *Lane v. State*, 59 Tex.Crim. 595, 129 S.W. 353, 357–358 (1910); *Taylor v. State*, 38 Tex.Crim. 552, 43 S.W. 1019, 1020 (1898); *Black v. State*, 1 Tex.App. 368, 381–385 (1876); *Burrell v. State*, 18 Tex. 713, 731–732 (1857). As the Court in *Garcia v. State*, 151 Tex.Crim. 593, 210 S.W.2d 574 (1948), recognized:

"It is generally agreed that the process of confrontation has two purposes. The main and essential one is to secure the opportunity of cross-examination [but t]he granted right is not fixed or immovable.... Exceptions exist to its application, as evidenced by the receipt of evidence of dying declarations and res gestae statements of deceased persons and the reproductions of testimony given by

12. Early in this Court's history, however, it was determined that the State constitutional provision providing that "the accused ... shall be confronted by the witnesses against him ...," Tex. Const. art. I, § 10, would be interpreted in accordance with the Sixth Amendment to the United States Constitution:

"The Constitution of 1876, in the Bill of Rights, provides that the accused 'shall be confronted by the witness against him.' The Constitution of the Republic of Texas in 1836, when after the battle of San Jacinto and defeat of Santa Anna, a Republican form of government was here instituted, this exact language was used. Again in 1845, when, after knocking at the door, Texas was admitted into the sisterhood of states, this same language was brought forward in the organic law; and was also reiterated in the Constitutions adopted in 1861, 1866, and 1869. The language has been the same in each of these instruments. The sixth amendment to the Constitution of the United States provides that the accused shall have the right to be 'confronted with the witnesses against him,' and this same language is written into the supreme law of almost every state in the Union, and was embodied in the Constitution of the United States, and the different states of the Union prior to the date of the organization of the Republic of Texas, and at the time of its admission into the Union. *Consequently Texas has but borrowed or copied this provision from the Constitutions and laws of the different governments of English-speaking people.* Owing to the different constructions placed on this provision of the Bill of Rights by this court at different periods of its existence, we have given the question more than usual consideration, and have searched, not only the decisions of our own state but those of the courts of the United States and of the courts of last resort of the different states and have

also burrowed into the role of construction and the construction given this language by the courts of England prior to the Declaration of Independence by the colonies. It is recognized by all courts that this provision was a part and parcel of the English law in the colonies prior to the revolt of the colonies, and *we, in adopting this clause, but reiterated what was the law in the colonies prior to our independence.*

"So when Texas adopted this clause, it was no announcement of a new right to a person accused of crime, but was simply a preservation of a right that was part of the law of England, of the Union, and of almost every state therein, and *in arriving at a proper construction thereof, and to give the language its proper meaning, we must look to the decisions of England, of the United States, and the courts of the different states in the Union, for of such of them as were in existence at the birth of the Texas Republic they had long had this principle embedded in their system of government....*" *Robertson v. State*, 63 Tex. Crim. 216, 142 S.W. 533, 533–534 (1911) (emphasis added).

13. Admittedly, in *Kemper*, the Court held that a defendant "confronts" the witnesses against him by "having them come face-to-face." 138 S.W. at 1039. *Kemper* was overruled the same year it was decided in *Robertson v. State*, which held that evidence of a witness from a former trial is admissible against an accused at his subsequent trial where the witness is either dead, insane or kept out of court by the wrongful actions of the accused. 142 S.W. at 546. Remarkably, the Court of Appeals relied upon this overruled case to find that the Texas Constitution always requires that the accused person, shall "come face-to-face" with the witnesses against him. *Gonzales*, 784 S.W.2d at 727. *Robertson* specifically held otherwise.

witnesses where prior opportunity of cross-examination has been accorded." 210 S.W.2d at 579 (opinion on rehearing) (citations omitted).

Thus, like the *Craig* court's interpretation of the Confrontation Clause, this Court has interpreted the right to confrontation under the Texas Constitution in light of important policy considerations such that, while finding face-to-face confrontation furnishes the greatest assurance of compliance with the Constitution we have not determined that such is the only method of guaranteeing the confrontation rights afforded by Article I, Section 10 of the Texas Constitution.

We understand and readily accept that we are at liberty to interpret our Constitution as providing greater safeguards than those provided under the federal Constitution. Neither appellant nor the Court of Appeals, however, has presented us with compelling arguments for such actions on our part and we do not perceive any justification for doing so in the case before us. As discussed above, the *Craig* court outlined the important considerations which would justify a departure from a face-to-face confrontation. Those same considerations are equally applicable in the case before us today. Taking into account first, that there was confrontation in the form of cross-examination in the case before us, and second, the exigencies of the particular case before us, we will not read the right to confrontation guaranteed under our State Constitution as affording appellant the right to face-to-face confrontation. In short, we will use the same analysis applied in *Craig* to determine if the State Constitution has been violated in the case before us.

## IV.

### APPLICATION OF THE LAW TO THE FACTS

When we apply the *Craig* criteria to the case at bar, we must conclude that appellant was not denied his constitutional rights as guaranteed under him under either the State or Federal Constitution. That is, in the case at bar where the trial court has made specific findings supported by evidence that the two-way closed-circuit system: was needed to protect Yolanda's welfare; that absent such a procedure Yolanda would be incapable of testifying in front of appellant; and that if the child were forced to testify in front of appellant such would add to or cause "severe trauma" to the child, we hold the use of the closed-circuit system did not offend either Constitution. We take into account that, albeit in a room away from appellant, the child's testimony was subject to rigorous adversarial testing. Yolanda testified under oath, was subject to extensive cross-examination, and was observed by the judge, the jury and appellant. See *Craig*, — U.S. at —, 110 S.Ct. at 3169–3170, 111 L.Ed.2d at 686. Indeed, due to the two-way system that was utilized (unlike the one-way system in *Craig*), Yolanda was able to observe appellant while she testified. See and cf., *Coy*, 487 U.S. at 1019, 108 S.Ct. at 2802 ("A witness 'may feel quite differently when he has to repeat his story looking at the man whom he will harm greatly by distorting or mistaking the facts.' "), quoting *Jay v. Boyd*, 351 U.S. 345, 375–376, 76 S.Ct. 919, 936, 100 L.Ed. 1242 (1956) (Douglas, J., dissenting); *Craig*, — U.S. at —, 110 S.Ct. at 3174, 111 L.Ed.2d at 692 ("[U]nwillingness [of child to testify in front of the defendant] cannot be a valid excuse under the Confrontation Clause whose very object is to place the witness under the sometimes hostile glare of the defendant.") (Scalia, J., dissenting).

The Court of Appeals in this case decided that allowing the child to give her testimony via the closed-circuit system was constitutionally infirm. Specifically, the Court of Appeals—while correctly assuming that the opinion expressed by Justice O'Connor would control disposition of this case—found that use of the closed-circuit system violated the Confrontation Clause because in this case "[t]here is no statute declaring a public policy regarding the situation, nor any legislative finding of necessity." We cannot agree with this analysis.

The Texas Legislature has sanctioned the use of a closed-circuit system (see footnote 3) but specified that the use of such is for those cases when the child witness is the "victim" of the offense and the offense is one specified within the statute. See Article 38.071, Sections 1 and 3, V.A.C.C.P.

Here the trial court judge allowed the child to testify in this murder case by way of the closed-circuit system because he believed that, since she was the victim in a sexual assault case then pending against appellant in another district court, the situation was covered by the statute. The Court of Appeals found that Article 38.071 did not authorize the trial court's actions because the child was neither the victim of the offense then being tried nor was the offense one that is enumerated in Article 38.071. *Gonzales*, 784 S.W.2d at 728. This may be so; nevertheless, addressing the question of whether the Legislature intended to extend Article 38.071's application to such a situation is really unnecessary for resolution of the issues. As the State has pointed out: "the 'bottom line' or central legal issue is the same with or without reference to article 38.071(3); the question being did the State's prosecutorial innovation violate the defendant's right to confrontation." State's Motion for Rehearing p. 4.

True, in *Craig*, the Supreme Court did talk in terms of the "State mak[ing] an adequate showing of necessity [such that] the state interest in protecting the child witness from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure...." —— U.S. at ——, 110 S.Ct. at 3169, 111 L.Ed.2d at 685. And we recognize that in *Coy* the Court intimated that exceptions to face-to-face confrontation "would ... be allowed only when necessary to further an important public policy." 487 U.S. at 1021, 108 S.Ct. at 2803.[14] But we see no reason why an expression of this important public policy must necessarily be in the form of an act or statute. More importantly, we have found nothing in any pertinent opinion from this Court or from the Supreme Court that would permit only the Legislature to make this "public policy" determination on behalf of the State. Here we recognize that among the general public policy considerations supporting the trial court's actions in the case before us, are: (1) an expressed legislative concern that "seeks ... [t]o exclude the offender from all hope of escape";[15] (2) an expressed legislative concern to protect children under similar circumstances;[16] and (3) the

**14.** The state's generalized "showing of necessity" (phraseology in *Craig*) appears to be nothing more than a delineation of "important public policy" (phraseology in *Coy*) that in certain situations, face-to-face confrontation must yield. However, as discussed above, this finding of necessity or public policy on the State's part is ancillary to the trial court's finding of necessity based upon the particular facts of the case. See *Craig*, —— U.S. at ——, 110 S.Ct. at 3169, 111 L.Ed.2d at 685 ("[t]he requisite finding of necessity must of course be a case-specific one ..."). See also *Coy*, 487 U.S. at 1021, 108 S.Ct. at 2803 ("even as to exceptions from the normal implications of the Confrontation Clause ... something more than the type of generalized finding underlying such a statute is needed when the exception is not firmly rooted in our jurisprudence").

**15.** See Article 1.03, V.A.C.C.P. See also *Craig*, —— U.S. at ——, 110 S.Ct. at 3175, 111 L.Ed.2d at 693 ("conviction[] of [a] guilty defendant[] ... is not an unworthy [State] interest") (Scalia, J., dissenting).

**16.** While we might find that Article 38.071 was not intended to cover the exact situation before us, that Article is a clear indication to us that the Legislature has recognized the importance of protecting the young from the turmoil associated with having to give testimony in a courtroom and because of such it has acted to eliminate or alleviate that trauma within the parameters of the Constitution. When the Legislature amended Article 38.071 in 1987 it added a statement of purpose:

"Purpose. The purpose of this statute is to establish procedures for the taking of testimony of child complainants in certain criminal prosecutions, while preserving the constitutional rights of defendants....

"The state interest concerns the children who are victims of sexual offenses and who are subjected to the intimidating nature of confronting the defendant and the pressures related to the ordinary participation of the victim in a courtroom, trial. *In addition, because a child is more likely than an adult to have a difficult time recovering from the trauma related to an offense*, it is in the state's interest that the child victim provide testimony as early as possible.

"Finally, it is in the interest of all parties that sufficient discretion be afforded courts hearing such cases, so that the competing interest can be balanced in an individualized manner. By providing the changes included in the Act the legislature believes that the courts will have a sufficiently flexible system that properly protects the rights of defendants while reducing the deleterious effects of the criminal justice system on certain child sex crime victims." [Emphasis added.]

Thus, Article 38.071 denotes a general legislative intent to protect the youth of this State from the

expressed affirmation and reaffirmation by the judiciary of this State and the United States that the protection of children is a legitimate and compelling state goal. See *New York v. Ferber*, 458 U.S. 747, 756–757, 102 S.Ct. 3348, 3354–3355, 73 L.Ed.2d 1113 (1982) (state interest in safeguarding the physical and psychological well-being of a minor is compelling); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 607, 102 S.Ct. 2613, 2620, 73 L.Ed.2d 248 (1982) (state interest in safeguarding protection of minor victims from further trauma); *FCC v. Pacifica Foundation*, 438 U.S. 726, 749–750, 98 S.Ct. 3026, 3040–3041, 57 L.Ed.2d 1073 (1978) (government interest in well-being of its youth); *Ginsberg v. New York*, 390 U.S. 629, 640, 88 S.Ct. 1274, 1281, 20 L.Ed.2d 195 (1968) (state has interest in the welfare of children and safeguarding them from abuses); *Prince v. Massachusetts*, 321 U.S. 158, 168, 64 S.Ct. 438, 443, 88 L.Ed. 645 (1944) (state may secure against dangers to children). See also *Duckett v. State*, 797 S.W.2d 906, 916 n. 15 (Tex.Cr.App.1990). Given these legitimate—indeed, unquestionable—state goals or public policies applicable to the case before us today, and given the trial court's case-specific determination that a certain procedure akin to that used in *Craig* was needed to protect the child witness, we do not read *Coy* or *Craig* as mandating some sort of enabling statute for the trial court's actions.

The judgment of the Court of Appeals is reversed and the cause is remanded to that Court to address appellant's due process claims that were not addressed on original submission.

BENAVIDES, Judge, concurring.

I agree with the majority that face-to-face confrontation between child witness and appellant was not required by the Sixth Amendment in this case. I am also willing to accept the conclusion that Texas constitutional law, like its federal counterpart, does not absolutely forbid testimonial procedures other than face-to-face confronta-

tion. I write separately to elaborate my own reasons for thinking that the constitutionality of alternative testimonial procedures does not depend upon the existence of enabling legislation, and that Article 38.-071 of the Code of Criminal Procedure does not represent an exhaustive treatment of Texas public policy for purposes of constitutional interpretation.

Trial judges have inherent authority to receive evidence. No special legislation is necessary. If it were, virtually every kind of evidence would be objectionable upon the ground that a statute did not specifically allow it. But our system of adjudication does not work in this way. Unless the law excludes evidence, or makes it excludable at the option of a litigant, trial courts are free to receive it. Hence, it is not improper for a trial judge to permit the testimony of senior citizens through megaphones in jaywalking cases even without prior legislative approval. Nor, likewise, is the lack of specific statutory authority for receiving the testimony of nonvictim child witnesses over closed-circuit television in murder cases a bar to its admissibility. Some ground other than the absence of enabling legislation must form the basis for any objection to evidence in the courts of this State.

In the present context, appellant does not urge a bar to the testimony here in question other than the Confrontation Clauses of the Sixth Amendment to the United States Constitution, and Article I, Section 10 of the Texas Constitution. Certainly a trial judge may not receive evidence in violation of these fundamental rights. But, insofar as the latter is concerned, I join the majority in its conclusion that Texas constitutional law has never really considered a face-to-face encounter absolutely essential to compliance with its Confrontation Clause. And, in case of the former, I am convinced that the question was authoritatively resolved contrary to appellant's position in *Maryland v. Craig*, 497 U.S. ——, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990).

traumas associated with testifying in a courtroom and this should be weighed as a factor in favor of upholding the trial court's decision in

the case before us, not as the Court of Appeals would have it, as a factor to be weighed against the trial court's actions.

Although the procedure at issue in *Craig* was prescribed by statute, there is nothing in the majority opinion there to suggest that the decision "whether use of the procedure is necessary to further an important state interest" must be made by the legislature. 110 S.Ct. at 3167. As I read the Court's opinion, so long as it is apparent that a state regards the welfare of its children as an important social interest, the need for and manner of implementing alternative testimonial procedures to effectuate that interest in individual cases is largely a question of fact to be resolved by trial judges under the test announced therein. *Id.* at 3169. Mandatory procedures enacted by the legislature can only serve to restrict the range of additional choices not offensive to the Confrontation Clause which might otherwise be available to the trial-level judiciary.

This is undoubtedly the effect of Article 38.071. The procedure set out in that or in any other constitutionally acceptable statute would certainly be available to trial judges even absent legislation. Since alternative testimonial procedures which violate the Confrontation Clause cannot be authorized by statute at all, and those consistent with the Clause are not objectionable on confrontation grounds anyway, the question whether an alternative testimonial procedure is offensive to constitutional confrontation guarantees ultimately has nothing whatever to do with the existence of a statute purporting to authorize it. The essential holding of *Craig* makes this clear:

> [W]here necessary to protect a child witness from trauma that would be caused by testifying in the physical presence of the defendant, at least where such trauma would impair the child's ability to communicate, the Confrontation Clause does not prohibit use of a procedure that, despite the absence of face-to-face confrontation, ensures the reliability of the evidence by subjecting it to rigorous adversarial testing and thereby preserves the essence of effective confrontation.

*Id.* at 3170.

I am unable to find in this rule any requirement, either express or implied, that the alternative procedures to which the Supreme Court there referred must first be approved by a state legislature before they may be found acceptable to the Constitution of the United States. Neither can I discern any principled basis for thinking that the constitutional rule is, or ought to be, confined to victim witnesses or to cases of sexually abused children. Rather, both by its terms and by its rationale, the rule is applicable to all children testifying in criminal cases and to all alternative testimonial procedures, whether imposed by the legislature or by the courts.

The contrary suggestion advanced by Judge Baird in his dissenting opinion fails to persuade me because his argument critically depends upon two circumstances which I find insignificant. He claims that, because *Craig* actually involved an alternative testimonial approach specifically authorized by statute, and because such statutes have become commonplace around the country, the Supreme Court must have intended to limit the scope of its holding to statutory procedures. However, I find very little practical reason for thinking this to be so, and no logical compulsion in the argument at all.

In the first place, appearance of the issue in context of a statute seems to me entirely fortuitous. I cannot imagine that the same procedures would have been thought to present a significantly different constitutional question when implemented by a trial judge on his own authority. Moreover, reference in its opinion to the relative ubiquity of similar legislation throughout the country simply cites widespread acceptance of the practice, and does not amount to a decision by the Supreme Court that state policy can only be expressed by its legislature, a question plainly beyond that Court's authority in any event. So far as I can discern, it is simply irrelevant for confrontation purposes who authorized the procedure in question.

Of course, I agree that the courts should not establish basic public policy in Texas. But courts must necessarily look to find that policy when pertinent to the resolution of legal disputes. The question of policy under *Craig* is not whether the people of Texas have opted to suspend the Confron-

tation Clause in specific, well-defined cases. They are not at liberty to do that in any event. *See Coy v. Iowa,* 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988). Rather, the *Craig* holding seems to me more interested in generalized, widely accepted policies of sufficient social importance to justify careful and limited exceptions on an individual basis to the otherwise absolute constitutional requirement of confrontation in the flesh. That such an interest exists in Texas for the protection of children seems past meaningful dispute to me. Whether the general requirement that all testimony be given in the defendant's presence should be compromised for the sake of a particular child is a question for the trial court.

If the legislature had elsewhere clearly expressed a policy that no courtroom testimony should be allowed except in the physical presence of the defendant, I might be inclined to think that Article 38.071 was meant as a list of specific exceptions to that general rule. But, in this instance, the general rule is expressed only in the Constitution, and the legislature has no authority to make exceptions. It follows that Article 38.071 cannot seriously be taken as an attempt by the legislature to prohibit the use of closed-circuit television except under the enumerated circumstances. If that were the case, one might have expected it to say so explicitly, rather than to list exceptions against an unarticulated policy. And, although Article 38.071 might actually have been intended to limit the Constitution, it clearly cannot be effective to such end. Consequently, the only permissible interpretation of the statute, no matter how counterintuitive, is that it prescribes a specific alternative testimonial procedure under certain defined circumstances, leaving the courts free to develop different procedures under other circumstances, constrained only by constitutional prohibitions. In short, the contention that Article 38.071 has anything to do with the issue before us is just mistaken. The essential question presented is solely a matter of constitutional exegesis, and does not involve statutory interpretation at all.

Be that as it may, I sympathize with the concerns expressed by Judge Clinton in his dissenting opinion. Of course, to the extent he may believe that enabling legislation is necessary for the procedure employed in this case, I disagree for the reasons already expressed. But, inasmuch as he intimates that this Court should avoid sanctioning the receipt of evidence tendered under a statute which plainly does not cover it, his point has an appealing aroma. Here, the State, as proponent of the evidence, expressly did rely upon Article 38.071 for its admissibility. Yet, as repeatedly noted here and in the dissenting opinions, that statute does not approve the procedure in question.

Nevertheless, our jurisprudence requires that a well-founded complaint be made at trial as a prerequisite to the assignment of judicial error on appeal. For present purposes, the only complaints which have reached us on discretionary review are that the procedure in question violated appellant's rights of confrontation and the terms of Article 38.071. Because I am convinced that no such violations occurred in this case, I am obliged also to conclude that appellant's trial objections were not well-founded. Accordingly, the judge did not err, in my opinion, to overrule them.

The only remaining questions are whether the trial judge in the instant cause made the findings required by *Craig,* and whether those findings, if made, are adequately supported by the record. Again, I am satisfied that the evidence adduced by the State on this matter was sufficient to support a finding by the judge that face-to-face confrontation of appellant would have been severely traumatic to the witness, that an alternative procedure was necessary (not just a convenience to the witness), and that the alternative procedure actually employed was adequate to ensure effective, contemporaneous cross examination of her testimony by the appellant and meaningful observation of her testimonial demeanor by the jury. Moreover, even though the trial of this case predated *Craig* by more than a year, it appears that the judge did in fact base his decision to allow the alternative procedure upon findings sufficiently like those required by *Craig* as to satisfy, in

my judgement, all pertinent concerns of the Confrontation Clause.

This, I believe, is the essential teaching of *Craig*, that exceptions to physical confrontation be made by trial judges on an individual basis, and not, as in *Coy*, by legislatures on a generic basis. This is as it should be. Evidentiary rulings and decisions about courtroom procedure fall within the province of the trial judge, who has broad discretion in such matters. Indeed, he is constrained only by rules of law, the constitution and his own sense of fairness. *See Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970); *Kimithi v. State*, 546 S.W.2d 323 (Tex.Cr.App.1977). Therefore, he may incorporate modern technology into courtroom procedure in any manner consonant with such limitations.

While the United States and Texas constitutions afford a criminal defendant the right to confront his accuser, that right does not absolutely require the defendant and the witness to be in the same room. Modern technology has facilitated a less traumatic confrontation for child witnesses. Under appropriate circumstances, such as those present in this case, I believe the alternative is constitutional.

For these reasons, I concur in the judgement of the Court.

CAMPBELL and OVERSTREET, JJ., join.

CLINTON, Judge, dissenting.

Notwithstanding the acknowledged determination by the court of appeals that what the trial court allowed here is not authorized by Article 38.071, V.A.C.C.P., *Gonzales v. State*, 784 S.W.2d 723, at 728 (Tex.App.—San Antonio 1990), or for that matter any other extant legislative enactment, the majority "see[s] no reason why an expression of this important public policy must necessarily be in the form of an act or statute." Further, it finds "nothing

in any pertinent opinion from this Court or from the Supreme Court that would permit only the Legislature to make this 'public policy' determination on behalf of the State." At 765. Accordingly, contrary to conventional wisdom that judges shall not make public policy through "judicial legislation," but merely construe laws already made by traditional policy makers, the majority causes this Court to put its imprimatur on an otherwise unauthorized, if not unconstitutional, procedural law sanctioned by the trial court in this cause. *Id.*, at 766.[1]

That this Court is empowered to prescribe public policy does not mean it must exercise that power as a matter of course. Whether a court will judicially legislate its way to a solution to a particular problem in a given situation is an internal policy question. Here, all germane considerations counsel for judicial restraint.

In his opinion for the San Antonio Court of Appeals, former Presiding Judge Onion pointed out the problem, *viz:*

"In the instant case we are dealing with a witness, a child witness, in a murder case. There is no statute declaring a public policy regarding the situation, nor any legislative finding of necessity. The State, however, relies exclusively upon TEX.CODE CRIM.PROC.ANN. art. 38.-071 [Testimony of Child Who is Victim of Offense] to carve out an exception to the right of confrontation under the circumstances presented."

*Gonzales v. State*, supra, at 727. Reviewing the history of legislative development of the present statute, Judge Onion concludes:

"... Neither version [of the statute], however, is applicable in murder cases nor to any witness except the child against whom the offense was committed. So on both scores the statute is inapplicable to the instant offense, and cannot operate as an exception to the

---

1. The majority thus demonstrates that bit of "conventional wisdom" is, and in my view has long been, no more than amiable fiction. See Clinton, *Examining The Appellate Judicial Function, The Republic Star,* July 1990, at 6. Of course, judges and courts are lawmakers and lawgivers! See Aldisert, *The Judicial Process,* Chapter I: Anatomy of Judge–Made Law, Section 3: The Judge as Lawmaker, p. 88 ff. (American Casebook Series, West Publishing Company 1978). The majority opinion proves the proposition.

constitutional core right of confrontation in the instant case."

*Id.*, at 728.

The Maryland statute as construed in *Maryland v. Craig*, 497 U.S. ——, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990), is similarly restricted to "child abuse victims." See majority at 761.

In his motion for rehearing to the San Antonio Court of Appeals the district attorney characterized his effort as "prosecutorial innovation," and during oral argument his assistant district attorney submitted that it was simply an extension of the existing statute under the Constitution. With deference, this Court should be guided more by public policy findings of the Legislature than by singlehanded experimental efforts by the prosecutorial element in the criminal justice system.

For those reasons, I respectfully dissent.

BAIRD, Judge, dissenting.

I respectfully dissent for two separate reasons. First, by not remanding this cause to the Court of Appeals for further consideration in light of *Maryland v. Craig*, —— U.S. ——, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990), the majority departs from our policy of reviewing "decisions" of the courts of appeals. Second, the majority departs from our proper role as a court of discretionary review and appoints itself "policy maker" for the State of Texas. For the following reasons, I would remand this cause to the Court of Appeals for further consideration in light of *Maryland v. Craig*, supra.

## I. DEPARTING FROM ESTABLISHED POLICY

Since 1981, when the intermediate appellate courts obtained jurisdiction over criminal cases, it has been our policy to limit our power of discretionary review to "decisions." The policy of only reviewing "decisions" is not unique to this Court. The United States Supreme Court has employed the policy for many years and just recently remanded two cases for our consideration in light of *Penry v. Lynaugh*, 492 U.S. 302,

109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). See *Richardson v. State*, 1991 WL 99949 (Tex. Cr.App.1991, No. 68,934, delivered June 12, 1991) and *Boggess v. State*, 1991 WL 87597 (Tex.Cr.App.1991, No. 69,990, delivered May 29, 1991).

Recently Presiding Judge McCormick, who today speaks for the majority, recounted the history of this policy in *Abdnor v. State*, 808 S.W.2d 476, 479 (Tex.Cr.App. 1991, McCormick, P.J., dissenting). Therein he recognized the policy had been criticized, but concluded that remanding a case to the court of appeals, for resolution of an issue not previously decided, was our policy and that we should not act contrary to "the policies we have imposed on ourselves." *Abdnor*, 808 S.W.2d at 480. See and contrast *Orn v. State*, 753 S.W.2d 394, 396 (Tex.Cr.App.1988) (Onion, P.J., dissenting and referring to the policy as launching cases into "heavenly appellate orbit").

We utilized the policy by remanding hundreds of cases to the courts of appeals to conduct a harmless error analysis in light of our decision in *Rose v. State*, 752 S.W.2d 529 (Tex.Cr.App.1988). We employed the policy most recently in *Tate v. State*, 811 S.W.2d 607 (Tex.Cr.App.1991), where Judge Miller, speaking for a unanimous Court, stated:

> We therefore reverse the judgment of the court of appeals and *remand this cause to that court for reconsideration of appellant's first point of error in light of Boyer.* [*v. State*, 801 S.W.2d 897 (Tex.Cr.App.1991).][1]

At pg. 608.

Likewise, we remand a case to a court of appeals for reconsideration when the United States Supreme Court delivers a pertinent decision after the court of appeals has delivered its opinion. In *State v. Wagner*, 810 S.W.2d 207 (Tex.Cr.App.1991), Presiding Judge McCormick remanded the cause to the court of appeals "for further consideration in light of" *Michigan v. Sitz*, —— U.S. ——, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990). At 208. See also *King v. State*, 800 S.W.2d 528 (Tex.Cr.App.1990).

The Court of Appeals delivered its opinion on *January 17, 1990.* The State filed

---

1. All emphasis herein is supplied by author unless otherwise indicated.

its petition for discretionary review on *March 27, 1990.* Appellant filed a response to the State's petition on *May 7, 1990.* We granted the State's petition on *June 13, 1990.* However, *Maryland v. Craig,* supra, was not decided until *June 27, 1990.* Therefore, the Court of Appeals acted without the benefit of the authority we now use to reverse its judgment.

Based on our established policy, we should remand this cause to the Court of Appeals for further consideration in light of *Maryland v. Craig,* supra. I believe it is improper for a majority of this Court to rely on authority to reverse a "decision" of a court of appeals without first providing that court with an opportunity to resolve the issue by utilizing the same authority. However, if we are to depart from our established policy we should at least provide the bench and bar with an explanation. Unfortunately, the majority opinion is silent on the subject. Therefore, the reason for today's departure from the policy we "imposed on ourselves" shall remain a mystery.

## II. SELF–APPOINTED POLICY MAKER

Rather than remand this cause to the Court of Appeals the majority addresses the confrontation issue and concludes the trial court did not err by permitting the child witness to testify outside of appellant's presence. I believe the majority not only departs from our proper role as a Court of discretionary review, it also appoints itself "policy maker" for the State of Texas in order to hold that the trial court did not err. For the following reasons, I believe that both the majority's self-appointment and ultimate conclusion is misguided.

### A. The Confrontation Clause of the 6th Amendment

The Sixth Amendment to the United States Constitution provides:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; *to be confronted with the witnesses against him;* to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.

The majority and I are in general agreement concerning the Sixth Amendment's provision of confrontation. Justice Scalia thoroughly discussed the Confrontation Clause in *Coy v. Iowa,* 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988). The *Coy* Court reversed the Iowa Supreme Court's judgment (which had affirmed Coy's conviction for sexually assaulting two thirteen-year-old girls) by holding the Sixth Amendment guarantees a face-to-face encounter between the witness and the accused.[2]

The perception that confrontation is essential to fairness has persisted over the centuries because there is much truth to it. A witness "may feel quite differently when he has to repeat his story looking at the man whom he will harm greatly by distorting or mistaking the facts. He can now understand what sort of human being that man is." [Citation omitted.] It is always more difficult to tell a lie about a person "to his face" than "behind his back." In the former context, even if the lie is told, it will often be told less convincingly. The Confrontation Clause does not, of course, compel the witness to fix his eyes upon the defendant; he may studiously look elsewhere, but the trier of fact will draw its own conclusions. Thus the right to face-to-face confrontation serves much the same purpose as a less explicit component of the Confrontation Clause that

---

**2.** The majority specifically notes that the lead opinion in *Coy* received only four votes. At 760. Unfortunately, we cannot expect anything more from today's United States Supreme Court. See, *James B. Beam Distilling Company v. Georgia,* — U.S. —, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991). Additionally, the lead opinion in *Franklin v. Lynaugh,* 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988), received just four votes but has been considered by this Court as authority when determining the constitutionality of Tex. Code Crim.Proc.Ann. art. 37.071.

we have had more frequent occasion to discuss—the right to cross-examine the accuser; both "ensur[e] the integrity of the fact-finding process." [Citation omitted.] The State can hardly gainsay the profound effect upon a witness of standing in the presence of the person the witness accuses, since that is the very phenomenon it relies upon to establish the potential "trauma" that allegedly justified the extraordinary procedure in the present case. That face-to-face presence may, unfortunately, upset the truthful rape victim or abused child; but by the same token it may confound and undo the false accuser, or reveal the child coached by a malevolent adult.

*Coy*, 108 S.Ct. at 2802.

Justice O'Connor filed a concurring opinion agreeing the Confrontation Clause was violated, but adding "nothing in today's decision necessarily dooms such efforts by *state legislatures* to protect child witnesses." *Coy*, 108 S.Ct. at 2803 (O'Connor J., joined by White, J., concurring).

The Supreme Court recognized an exception to the general rule of face-to-face confrontation in *Maryland v. Craig*, —— U.S. ——, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). In *Craig*, Justice O'Connor, writing for the majority, succinctly stated the issue:

This case requires us to decide whether the Confrontation Clause of the Sixth Amendment categorically prohibits a child witness *in a child abuse case* from testifying against a defendant at trial, outside the defendant's physical presence, by one-way closed circuit television.

*Craig*, 110 S.Ct. at 3160.

The Maryland statute permitted the factfinder to receive, by one-way closed circuit television, the testimony of a child witness alleged to be the victim of child abuse, if the trial judge first determined that the courtroom testimony of the child victim would result in the child suffering serious emotional distress to the extent that the child could not reasonably communicate. The child in *Craig* was six years of age. Such a determination was made and the child witness, prosecutor and defense counsel left the courtroom. The child witness

was examined and cross-examined in a separate room while a video monitor recorded and displayed the testimony to the judge, jury and defendant in the courtroom. The defendant remained in electronic communication with defense counsel.

Justice O'Connor noted:

We have never held, however, that the Confrontation Clause guarantees criminal defendants the *absolute* right to a face-to-face meeting with the witnesses against them at trial. Indeed, in *Coy v. Iowa*, we expressly "le[ft] for another day ... the question whether any exceptions exist" to the "irreducible literal meaning of the Clause: 'a right to *meet face to face* all those who appear and give evidence *at trial*.'"

*Craig*, 110 S.Ct. at 3163 [emphasis in original].

After noting the many "hearsay exceptions" recognized by the Supreme Court, Justice O'Connor opined:

[A] literal reading of the Confrontation Clause would "abrogate virtually every hearsay exception, a result long rejected as unintended and too extreme." [Citation omitted.] Thus, in certain narrow circumstances, "competing interests, if 'closely examined' may warrant dispensing with confrontation at trial." ...

In sum, our precedents establish that "the Confrontation Clause reflects a *preference* for face-to-face confrontation at trial," [citation omitted] a preference that "must occasionally give way to considerations of public policy necessities of the case," [citation omitted].

That the face-to-face confrontation requirement is not absolute does not, of course, mean that it may easily be dispensed with. As suggested in *Coy*, our precedents confirm that a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimo-

ny is otherwise assured. [Citations omitted.]

*Craig*, 110 S.Ct. at 3165.

Justice O'Connor then restated the issue: "The critical inquiry in this case, therefore, is whether use of the procedure is necessary to further an important state interest." Id. at 3167. Justice O'Connor recognized "a significant majority of States has *enacted statutes* to protect child witnesses from the trauma of giving testimony in child abuse cases attests to the widespread belief in the importance of such public policy." Id. at 3167. After discussing the legislative history and intent of the Maryland statute, Justice O'Connor and a majority of the Supreme Court refused to "second guess the considered judgment of the *Maryland Legislature* regarding the importance of its interest in protecting *child abuse victims* from the emotional trauma of testifying." Id. at 3169.

In short, *Coy* stands for the general proposition that face-to-face confrontation between the witness and the accused is required under the Sixth Amendment. *Craig* provides an exception to the general rule when it is necessary to further an important state interest, as established by the legislature, namely, protecting the psychological well-being of child abuse victims.[3]

### B. Is There A Sixth Amendment Exception?

All parties recognize there was no face-to-face confrontation between appellant and the child witness. Accordingly, the question is whether this case falls within the ambit of exception provided by *Craig*.

#### i. No Statutory Exception

The majority recognizes that any exception to the general rule of face-to-face confrontation would be found at art. 38.071 Tex.Code Crim.Proc.Ann. As noted by the majority, the State relied upon Art. 38.071 in the case at bar. At 758.[4] However, the majority correctly recognizes the statute does not permit a child witness in a murder case to testify outside the physical presence of the accused. At 765. Article 38.-071 provides:

Art. 38.071. Testimony of Child Who is Victim of Offense

Sec. 1. This article applies *only* to a proceeding in the prosecution of an offense defined by any of the following sections of the Penal Code ...

(1) Section 21.11 (Indecency with a Child);

(2) Section 22.011 (Sexual Assault);

(3) Section 22.02 (Aggravated Assault);

(4) Section 22.021 (Aggravated Sexual Assault);

(5) Section 22.04(b) (Injury to a Child or an Elderly Individual);

(6) Section 22.04(c) (Injury to a Child or an Elderly Individual), if the conduct is committed intentionally or knowingly;

(7) Section 25.02 (Incest);

(8) Section 25.06 (Solicitation of a Child), if the offense is a felony of the third degree; or

(9) Section 43.25 (Sexual Performance by a Child).

By its express terms, Art. 38.071 applies *only* to the enumerated offenses. Two things are readily apparent from Sec. 1: First, the Legislature obviously gave a great deal of time and consideration to

---

**3.** The majority states: "[W]e do not read *Coy* or *Craig* as mandating some sort of enabling statute for the trial court's actions." At 766. I believe the majority's interpretation of *Coy* and *Craig* is erroneous because both cases addressed the constitutionality of enabling *statutes*. In *Coy* the State argued that the *statute* created a *legislatively* imposed presumption of trauma. 108 S.Ct. at 2803. In *Craig*, Justice O'Connor specifically lists the *statutory enactments* of the various states designed to protect the child witness in her search to find public policy. *Craig*, 110 S.Ct. at 3167 nn. 2, 3 and 4. Also in *Craig*, Justice O'Connor specifically declined to second

guess the *Maryland Legislature*. 110 S.Ct. at 3169. Neither opinion suggests that a court could, on its own motion, admit non-confrontational testimony.

**4.** Appellant's sole point of error on direct appeal, with which the Court of Appeals agreed, was:

The trial court erred in allowing a child-witness to testify by means of closed circuit TV under TEX.CODE CRIM.PROC.ANN. art. 38.071 (testimony of child who is victim of offense).

which offenses should be included, and 2) Section 19.02 (Murder) was specifically omitted.

In *Ex parte McIver*, 586 S.W.2d 851, 856 (Tex.Cr.App.1979), we held:

> It is a well-known rule of statutory construction in this State and elsewhere that the express mention or enumeration of one person, thing, consequence, or class is *tantamount to an express exclusion* of all others. [Citations omitted.] This rule has been pronounced a logical, sensible, and sound rule of statutory construction. [Citations omitted.]

Therefore, the Legislature, by not including murder in Section 1, expressly excluded that offense.

In *Lyons v. State*, 812 S.W.2d 336 (Tex. Cr.App.1991), we were asked to determine if a trial court had the authority to fashion a sanction where the State had the video equipment required under Tex.Rev.Civ. Stat.Ann. art. 6701*l*–1 note, Acts 1983, ch. 303, § 24 but did not to utilize the equipment pursuant to a policy of not videotaping individuals who consented to a breath test. In *Lyons* we recognized that the *Legislature* had provided a sanction for such a circumstance, if the State failed to videotape a person arrested for DWI, that failure was admissible at trial. The *Lyons* Court stated: "If the sanction in the statute proves ineffective to carry out the intent of the statute, *it is the Legislature's prerogative, not the courts' prerogative,* to add further sanctions." At 340. Therefore, this Court is not authorized to judicially amend Art. 38.071 § 1 to include murder.

### *ii. No Hearsay Exception*

The majority next attempts to find an exception within the Rules of Criminal Evidence. At 758. The Rules of Criminal Evidence provide twenty-seven separate exceptions to the prohibition of hearsay evidence; however, those exceptions do not cover the circumstances of the case at bar. In fact, this Court unanimously reversed two convictions recently where hearsay evidence was admitted without a recognized exception to the hearsay prohibition. See *Deeb v. State*, 815 S.W.2d 692 (Tex.Cr.App.

1991), and *Meador v. State*, 812 S.W.2d 330 (Tex.Cr.App.1991).

### *iii. A Public Policy Exception?*

Failing to find either a statutory or evidentiary exception providing for less than face-to-face confrontation between the accused and a child witness in a murder case, the majority addresses the issue of public policy:

> True, in *Craig*, the Supreme Court did talk in terms of the "State mak[ing] an adequate showing of necessity [such that] the state interest in protecting the child witness from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure...." —— U.S. ——, 110 S.Ct. at 3169, 111 L.Ed.2d at 685. And we recognize that in *Coy* the Court intimated that exceptions to face-to-face confrontation "would ... be allowed only when necessary to further an important public policy." 487 U.S. at 1021, 108 S.Ct. at 2803. [footnote omitted] *But we see no reason why an expression of this important public policy must necessarily be in the form of an act or statute. More importantly, we have found nothing in any pertinent opinion from this Court or from the Supreme Court that would permit only the Legislature to make this "public policy" determination on behalf of the State.*

At 765.

This conclusion presents three distinct questions: a) Where should public policy be formulated? b) Who has the authority to establish public policy? and c) What is the public policy?

### a. Traditional public policy formulation

Traditionally, legislative bodies have been considered the proper fora for the formulation of public policy. In that process, legislation is publicly introduced in the form of a bill. The bill is then assigned to a committee. The committee conducts public hearings on the proposed legislation to hear testimony from proponents and opponents of the legislation. The bill then

goes to the floor of the legislative body for full debate and a record vote. This process provides an opportunity for every Texan to participate in the public policy debate, by either personally testifying before the committee or through the recorded vote of his/her duly elected representative.

On the other hand, the judiciary is ill-equipped to formulate public policy. Appellate judges deal with a particular set of facts and should constrain themselves to address only the legal issues raised in that factual scenario. Far from being accessible to the public, only lawyers have an opportunity to communicate with appellate judges and even their communication is limited to the particular case under submission. Their communication is highly structured in the form of appellate briefs and oral arguments which are limited to the appellate record and the particular grounds for review. Other than the briefs and oral arguments, appellate courts operate in a totally secret environment. In fact the secrecy is so guarded that it is a felony offense to prematurely reveal the result or content of a proposed or actual opinion to any person outside the confines of the particular appellate court. Sec. 39.03 Tex.Penal Code Ann.

In a democracy, public policy is better formulated in the bright light of legislative debate rather than behind the closed doors of an appellate conference room. The majority should exercise judicial restraint and leave the formulation of the State's public policy to the Legislature.

**b.  Is there authority for an appellate court to establish public policy?**

One should question whether an appellate court has the authority to establish public policy. The majority can find no precedent authorizing this Court to establish public policy. I believe the lack of precedent is sufficient reason *not* to enter into an area reserved for the Legislature, rather than authority for so doing.

The majority *grabs the authority* to establish public policy by holding: "We understand and readily accept that we are at liberty to interpret our Constitution as providing greater safeguards than those pro-

vided under the federal constitution." At 764. See *Heitman v. State,* 815 S.W.2d 681 (Tex.Cr.App.1991). Unquestionably, we have the authority to interpret our Constitution; however, the authority to interpret our Constitution should not be transformed into the power to usurp the authority of the Legislature.

Article 2, § 1 of the Texas Constitution provides:

> The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are Legislative to one, those which are Executive to another, and those which are Judicial to another, *and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted.*

I believe the majority violates the separation of powers doctrine by acting as 1) the Legislature by amending Art. 38.071; 2) as the Executive by ratifying the amendment; and 3) as the Judiciary by passing upon the constitutionality of the amendment. We should practice what we preach. See *Armadillo Bail Bonds v. State,* 802 S.W.2d 237 (Tex.Cr.App.1990), *Meshell v. State,* 739 S.W.2d 246 (Tex.Cr.App.1987), and *Rose v. State,* 752 S.W.2d 529 (Tex.Cr.App. 1988).

We should act in a slow, cautious and judicious manner consistent with our oath to preserve and protect our Constitution. We are not authorized to establish public policy; that function is constitutionally delegated to the Legislature.

**c.  Is it really public policy?**

To determine public policy we should consider the actions of the recently completed Regular Session of the 72nd Legislature. Appellant was convicted on *July 7, 1988.* The Court of Appeals reversed the judgment on *January 17, 1990.* The 72nd Legislature convened, almost one year later, on *January 8, 1991.* The 72nd Legislature considered Senate Bill No. 1326 which pro-

posed amending Art. 38.071 to permit a child to testify outside of the presence of a defendant if the child *witnessed* a murder. However, *the legislation did not pass*, in fact it never even reached the House floor for debate.[5]

If the proposed amendment to Art. 38.071 could not pass the Legislature how can the majority proclaim that its actions today are in response to "unquestionable" public policy? At 766. Under such reasoning, the mere introduction of a bill establishes public policy or, stated another way, inaction by the Legislature on proposed legislation establishes public policy for the State. If this were true, every piece of legislation that died during the 72nd Legislature established public policy for the State of Texas.

I believe the majority confuses public policy with "prosecutorial innovation." At 765. A "prosecutorial innovation" which is neither statutorily permitted nor Constitutionally authorized is *not* public policy.

## C. Necessity

A determination of public policy is only the threshold question. *Craig* has a second prong, a case-specific finding of necessity. *Craig*, 110 S.Ct. at 3169. In the case at bar no expert testimony was offered in support of the State's motion. However, two witnesses did testify: Alverez, an employee of the District Attorney's Office, whose job it was to prepare child witnesses for trial; and Ramos, the child's grandmother. At 759.

In *Craig*, the trial judge made a determination of necessity based upon expert testimony which substantiated that the child witness would suffer serious emotional distress to the extent the witness could not reasonably communicate. *Craig*, Id. at 3161.

The majority glosses over this prong by merely stating: "the trial court's case-specific determination that a certain procedure akin to that used in *Craig* was needed to protect the child witness." At 766. Additionally, the majority fails to address that portion of the Court of Appeals opinion stating:

It is true that in a supplemental transcript there is found "Findings of Facts and Conclusions of Law," which instrument is undated and bears no file mark, although recorded in the minutes of the district court. The "findings of facts" are mere recitations of facts, listing appellant's objections and the State's arguments. *They do not involve the resolution of any factual dispute.* [Emphasis added.] The "conclusions of law" are broad and general. The first states that the closed circuit system was necessary to further "the essential state interest in the protection of *this* child witness." [Emphasis in original.] *The "interest" is*

---

5. On the issue of legislative intent the majority states:

> While we might find that Article 38.071 was not intended to cover the exact situation before us, that Article is a clear indication to us that the Legislature has recognized the importance of protecting the young from the turmoil associated with having to give testimony in a *courtroom* and because of such it has acted to eliminate or alleviate that trauma within the parameters of the Constitution.
>
> \* \* \* \* \* \*
>
> Thus, Article 38.071 denotes a general legislative intent to protect the youth of this State from the trauma associated with testifying in a *courtroom* and this should be weighed as a factor in favor of upholding the trial court's decision in the case before us, not as the Court of Appeals would have it, as a factor to be weighed against the trial court's action.

At 765, n. 16.

If the Legislature's intent is to protect a child witness from a generalized fear of the court-room such an intent is unconstitutional and contrary to Tex.Gov't Code Ann. § 311.021(1). In *Craig*, Justice O'Connor made it clear that before a child witness is permitted to testify outside of the presence of the defendant:

> The trial court must also find that the child witness would be traumatized, *not by the courtroom generally, but by the presence of the defendant*. [Citations omitted.] Denial of face-to-face confrontation is not needed to further the state interest in protecting the child witness from trauma unless it is the presence of the defendant that causes the trauma. In other words, if the state interest were merely the interest of protecting child witnesses from courtroom trauma generally, denial of face-to-face confrontation would be unnecessary because the child could be permitted to testify in less intimidating surroundings, albeit with the defendant present.

*Craig*, 110 S.Ct. at 3169.

*not otherwise identified. No statute is cited and no evidence is referred to as establishing such public policy.* [Emphasis added.] The second conclusion is more of a finding of fact referring to "severe trauma" necessitating the use of television. The third conclusion merely states that the *Coy* requirements were met.

*Gonzales,* 784 S.W.2d at 728.

The Court of Appeals is correct. Such generalized findings and conclusions are insufficient under both *Coy* and *Craig.*

### III. CONCLUSION

The record in this case discloses the brutal and senseless killing of a child. Clearly, this is an emotional case for all concerned and we, as appellate judges, are not insulated from our emotions by the cold appellate record. However, we must resist the urge to turn our heads and ignore the mandates of the United States Constitution. We are sworn to uphold that hallowed document and resist the temptation to give in to our emotional sense of justice. As Justice Scalia said in *Coy:* "It is a truism that constitutional protections have costs." *Coy,* 108 S.Ct. at 2802.

For the foregoing reasons, I would follow the established policy of this Court and remand the cause to the Court of Appeals for further consideration in light of *Maryland v. Craig,* supra. However, since the majority departs from that policy and addresses the merits, I would conclude that the actions of the trial court violated the Confrontation Clause of the Sixth Amendment.[6] Because the majority neither remands the case nor recognizes the violation, I respectfully lodge this dissent.

MALONEY, Judge, dissenting.

The conduct of the trial court in this case goes beyond what the Legislature intended in enacting Article 38.071 of the Texas Code of Criminal Procedure and, regardless of our sympathies, is the first step in ex-

tending the boundaries of a statute that, by its very terms, is meant to be restrictive in application. Certainly its application to the facts of this case is open to constitutional question. *See Kentucky v. Stincer,* 482 U.S. 730, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987); *Coy v. Iowa,* 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988); *Maryland v. Craig,* — U.S. —, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990).

Public policy demands that we protect witnesses from abuse and particularly that we protect the child witness to the greatest degree possible; but not at the expense of fundamental law. A child as well as an adult can manipulate the truth. But a child because he or she is a child and for that reason alone, is sometimes more acceptable to the jury as being a truthful witness than an adult. We all want to believe children are truthful, particularly those who are testifying in an adult world; but who can forget the child who, when accused by his parents, fabricated strange yet believable tales for whatever reason and got away with it.

Our system of confrontation by its operation is designed to obtain the truth. Segregation of a witness by the Judge from the environs of the Court has a tendency to place that witness in a status of unquestioned credibility. The plurality allows the segregation today with a child; tomorrow perhaps with the elderly; next week, with a pregnant woman and so on.

The danger of diminution of the protection guaranteed by the confrontation clauses of both the State and Federal Constitutions is much too great if the conduct of the trial court in this case is allowed to stand. For this reason, I respectfully dissent.

---

**6.** Because the Sixth Amendment has been violated there is no reason to determine the propriety of the trial court's actions in light of the Texas Constitution.